## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN FUMICH, LAURA MISCHLEY, RAPHAEL HINTON, RONNIE MCLEAN, and THOMAS CHAFFIN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NOVO NORDISK INC., THE BOARD OF DIRECTORS OF NOVO NORDISK INC., THE NOVO NORDISK INC. RETIREMENT COMMITTEE, and JOHN DOES 1- 30, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **CIVIL ACTION NO.:** |

## CLASS ACTION COMPLAINT

Plaintiffs John Fumich, Laura Mischley, Raphael Hinton, Ronnie McLean, and Thomas Chaffin ("Plaintiffs"), by and through their attorneys, on behalf of the Novo Nordisk Inc. 401(k) Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

## I.   INTRODUCTION

1.   This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Novo Nordisk Inc. ("Novo Nordisk" or "Company") and the Board of Directors of Novo Nordisk Inc. and its members (the "Board") during the Class Period[2] and the Novo Nordisk Inc. Retirement Committee and its members (the "Committee") during the Class Period.

2.   To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.   The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they

---

[2] As discussed in more detail below, the Class Period is defined as September 13, 2018 through the date of judgment ("Class Period").

continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

5.      At all times during the Class Period, the Plan had at least $1.2 billion dollars in assets under management. The Plan's assets under management for all funds as of December 31, 2018 was $1,222,746,393 and by 2023 the assets under management had risen to $2,303,296,181. *See* 2018 Form 5500 of the Novo Nordisk Inc. 401(k) Savings Plan ("2018 Form 5500"), Schedule H and 2023 Form 5500 of the Novo Nordisk Inc. 401(k) Savings Plan ("2023 Form 5500"), Schedule H, respectively. In 2018, plans with over $1 billion in assets made up only 0.01 percent of all plans in the United States.[3]

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

3

6.      The Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plan had substantial bargaining power to obtain the most cost-efficient investments. Defendants, however, did not exercise appropriate judgment in scrutinizing each investment option, initially and on an ongoing basis, that was offered in the Plan to ensure it was prudent.

7.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

8.      Plaintiffs further allege that during the putative Class Period, Defendants breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's Recordkeeping and Administrative ("RKA") costs.

9.      Another way in which Defendants breached their duty to Plan participants was in failing to defray reasonable expenses of administering the Plan. 29 U.S.C. § 1104(a)(A)(ii). Defendants' failure stems from the use of Plan participant forfeited funds to reduce Company contributions to the Plan instead of

using the funds to reduce or eliminate the amounts charged to Plan participants for RKA services. This action by the Company was a clear breach of the duty of loyalty to Plan participants and cost Plan participants millions of dollars.

10.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

11.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), breach of ERISA's Anti-Inurement Provision (Count III) and failure to monitor fiduciaries (Count IV).

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

13.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    THE PLAN'S INVESTMENTS

15.    Several investments were available to Plan participants as investment options each year during the putative Class Period.

16.    At the beginning of 2018 to at least year-end 2023, the Plan's assets included the Schwab Managed Retirement Target Date Funds in the V and VI share classes. *See* Independent Auditor's Report attached to 2018 Form 5500 of the Novo Nordisk Inc. 401(k) Savings Plan at 16 and Independent Auditor's Report attached to 2023 Form 5500 at 16.

17.    Target date funds are designed to provide a single diversified investment vehicle for plan participants. The target date refers to the participant's expected retirement year. For example, "target date 2040" investments are designed for individuals who intend to retire in 2040.

18.    The Schwab Managed Retirement Target Date Funds are not mutual funds, but collective investment trusts ("CITs"). A CIT is a tax-exempt, pooled

6

investment vehicle available only to qualified retirement plans and certain governmental retirement plans (as defined in Internal Revenue Code Section 414(d)). Many CITs, like the Schwab Managed Retirement Target Date Funds, have a similar structure to mutual funds.

19.     Schwab has offered target date funds dating as far back as several years before the start of the Class Period. The V share class was not available until August 25, 2016. On June 17, 2021, pursuant to an amendment to the SchwabPlan™ Services Agreement effective January 1, 1999, the Schwab Managed Retirement Target Date Funds VI share class was added to the Plan and the assets in the V class were replaced and transferred to the VI class. *See* Amendment to the SchwabPlan™ Services Agreement between Novo Nordisk Inc. and Charles Schwab & Co., Inc., dated June 17, 2021.

20.     For ease of reference, each iteration of the Schwab Managed Retirement Target Date Funds, whether V or VI share classes, will be referred to herein as the "Schwab Target Date Funds" where applicable.

21.     Lastly, the Schwab Target Date Funds corresponding with the various target years, *e.g.,* 2030, 2035, 2040, etc, are referred to collectively herein as the "Schwab Target Date Series."

## IV.   PARTIES

### Plaintiffs

22.   Plaintiff, John Fumich ("Fumich"), resides in Morgantown, WV. During his employment, Plaintiff Fumich participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Fumich specifically invested in the Schwab Target Date Funds, specifically the Schwab Managed Retirement Trust 2040 Cl V fund and suffered injury to his Plan account due to significant underperformance of the funds, including the 2040 fund. In addition, Plaintiff Fumich was subject to the excessive RKA costs. Plaintiff Fumich suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Fumich also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Fumich's individual account to pay for the RKA costs.

23.   Plaintiff, Laura Mischley ("Mischley"), resides in Lakeland, FL. During her employment, Plaintiff Mischley participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Mischley specifically invested in the Schwab Target Date Funds, specifically the Schwab Managed Retirement Trust 2030 Cl V fund, the Schwab Managed Retirement Trust 2040 Cl V fund, the Schwab Managed Retirement Trust 2030 Cl VI fund, and the

8

Schwab Managed Retirement Trust 2040 Cl VI fund and suffered injury to her Plan account due to significant underperformance of the funds, including the 2030 and 2040 funds. In addition, Plaintiff Mischley was subject to the excessive RKA costs. Plaintiff Mischley suffered injury to her Plan account by overpaying for her share of RKA costs. Plaintiff Mischley also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Mischley's individual account to pay for the RKA costs.

24. Plaintiff, Raphael Hinton ("Hinton"), resides in Wilson, NC. During his employment, Plaintiff Hinton participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Hinton suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Hinton also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Hinton's individual account to pay for the RKA costs.

25. Plaintiff, Ronnie McLean ("McLean"), resides in Garner, NC. During her employment, Plaintiff McLean participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive RKA costs. McLean suffered injury to her Plan account by overpaying for her share of RKA

costs. Plaintiff McLean also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff McLean's individual account to pay for the RKA costs.

26.     Plaintiff, Thomas Chaffin ("Chaffin"), resides in Roanoke, VA. During his employment, Plaintiff Chaffin participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Chaffin specifically invested in the Schwab Target Date Funds, specifically the Schwab Managed Retirement Trust 2045 Cl VI fund and suffered injury to his Plan account due to significant underperformance of the funds, including the 2045 fund. In addition, Plaintiff Chaffin was subject to the excessive RKA costs. Plaintiff Chaffin suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Chaffin also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Chaffin's individual account to pay for the RKA costs.

27.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their

10

accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

28.     Plaintiffs did not have knowledge of all material facts (including, among other things, how target date funds in a retirement plan should perform as compared to their peers and benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

29.     Novo Nordisk is a named fiduciary of the Plan with a principal place of business at 800 Scudders Mill Rd, Plainsboro Township, New Jersey 08536. Novo Nordisk engages in the research and development, manufacture, and distribution of pharmaceutical products in Europe, the Middle East, Africa, Mainland China, Hong Kong, Taiwan, North America, and internationally.

30.     Novo Nordisk, directly or acting through its Board, appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

11

31.     Accordingly, Novo Nordisk during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

32.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

33.      The Board appointed the Committee to, among other things, "to carry out the Company's responsibility to administer the Plan in accordance with the Charter of the Retirement Committee of the Company." Novo Nordisk Inc. 401(k) Savings Plan, Effective as of January 1, 2024, Document ("Plan Doc.") at 56. As noted above, under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

34.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

35.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

36.     The Committee's role is to "administer the Plan in accordance with its terms and the Charter of the Retirement Committee of the Company and shall have all the powers necessary to carry out the provisions of the Plan." Plan Doc. at 57.

37.     As administrator of the Plan, the Committee had "exclusive authority and discretion to direct the Trustee to establish one or more investment funds for the investment of the assets of the Trust Fund. Such investment funds may include, but need not be limited to, mutual funds managed by an investment company or companies selected by the Administrator." Plan Doc. at 54.

38.     Further, "[i]n directing the Trustee with respect to the investment funds for the investment of assets of the Trust fund, the Administrator shall use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. The Administrator may, at any time, direct that a new investment fund or funds be established and/or discontinue an existing investment fund or funds." Plan Doc. at 55.

39.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan's assets.

13

40. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

41. To the extent that there are additional officers, employees and/or contractors of Novo Nordisk who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Novo Nordisk officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

14

## V.    CLASS ACTION ALLEGATIONS[4]

42.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 13, 2018 through the date of judgment (the "Class Period").

43.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 10,201 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 at 2.

44.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same

---

[4] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

15

conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

45. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

- Whether Defendants are/were fiduciaries of the Plan;

- Whether Defendants breached their fiduciary duty of prudence and loyalty by engaging in the conduct described herein;

- Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

- The proper form of equitable and injunctive relief; and

- The proper measure of monetary relief.

46. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

47.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

48.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    THE PLAN

49.    The Plan is a defined contribution plan covering substantially all eligible employees of Novo Nordisk intended to provide retirement benefits to the employees. *See* Summary Plan Description for the Novo Nordisk Inc. 401(k) Savings Plan, effective January 1, 2024 ("SPD") at 4. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for

17

each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

*Eligibility*

50.    In general, the Plan covers all employees of Novo Nordisk. *See* SPD at 4.

51.    Unless an employee opts out of the automatic enrollment feature of the Plan, an employee will automatically be enrolled in the Plan after the sixty-day period following the employee's date of hire. *See* SPD at 5.

52.    Temporary employees are eligible to participate in the Plan on the first day of the month after the employee completes 1,000 hours of service during the twelve-month period that begins on the date of hire. *See* SPD at 4.

*Contributions*

53.    Subject to limitations of the Internal Revenue Service and the Internal Revenue Code of 1986, as amended, there are several types of contributions that an employee can make to the plan, which are employee pre-tax contributions (including catch-up contributions), Roth 401(k) contributions (including catch-up contributions), and after-tax contributions. *See* Plan Doc. at 15; *see also* SPD at 7.

18

54.    An employee may also make qualified rollover contributions from another qualified retirement plan from a prior employer and/or an individual retirement account. *See* SPD at 8.

55.    An employee may contribute up to 50% of the employee's compensation to the Plan as an employee pre-tax deferrals and Roth 401(k) contributions. *See id.*

56.    Further, an employee may contribute up to 15% of the employee's compensation to the plan as after-tax contributions. *See id.*

57.    Novo Nordisk contributes a matching contribution that is equal to 50% of the first 2% of an employee's pre-tax contribution and Roth 401(k) contribution. *See id.* at 10.

58.    An employee also receives a basic employer contribution, even if the employee does not elect to make pre-tax deferrals. *See id.* at 11. The basic employer contribution is equal to 8% of an employee's compensation. *See id.*

59.    Like other companies that sponsor 401(k) plans for their employees, Novo Nordisk enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

19

60. Novo Nordisk's employees benefit in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

61. Given the size of the Plan, Novo Nordisk likely enjoyed a significant tax and cost savings from offering a match.

*Accounts*

62. For the different types of contributions made to the Plan, separate accounts are set up on the Participant's behalf, which include: employee pre-tax deferral account; matching contribution account; basic employer contribution account; after-tax contribution account; Roth 401(k) contribution account; Roth in-Plan account; and rollover account. *See* SPD at 8.

*Vesting*

63. Participants in the Plan "are always 100% vested" in accounts attributable to employee pre-tax deferrals, Roth 401(k) contributions, catch-up contributions, after-tax contributions or Roth in-Plan conversions, and rollover contributions, plus earnings on those contributions. *See id*. at 17.

64. However, participants are 100% vested in accounts attributable to matching contributions and basic employer contributions, plus any earnings on those contributions, after three (3) years of service. *See id.*

65. Between one (1) and two (2) years of service, participants are 33% vested in accounts attributable to matching contributions and basic employer contributions. *See id.* at 18.

66. Between two (2) and three (3) years of service, participants are 66% vested in accounts attributable to matching contributions and basic employer contributions. *See id.*

*Forfeiture*

67. Forfeiture of non-vested money in Plan participant accounts occurs "on the earlier of the distribution of [the employee's] entire vested account, or the date on which you incur a break in your period of service of 5 consecutive years." *See id.*

68. Forfeiture may also occur for unclaimed vested amounts of Plan participants who cannot be located. *See* Plan Doc. at 35.

69. "All forfeited amounts may be used to reduce the applicable Employer's future contributions, restore forfeited Accounts, as described above, or pay certain Plan expenses." SPD at 19.

70. Specifically, under the Plan document:

(a) Forfeitures of Basic Employer Contributions shall be used to reduce Basic Employer and Matching Contributions for the Employer which employs or employed the Employees incurring the forfeiture, restore Accounts pursuant to Section 8.4, and/or to pay Plan expenses the choice of which is at the Company's sole discretion in its capacity as Plan settlor.

(b) Forfeitures of Matching Contributions shall be used to reduce Basic Employer and Matching Contributions for the Employer which employs or employed the Employees incurring the forfeiture, restore Accounts pursuant to Section 8.4, and/or to pay Plan expenses the choice of which is at the Company's sole discretion in its capacity as Plan settlor.

Plan Doc. at 35.

71. The Auditor Report attached to the Plan's 2023 Form 5500 states "Forfeited non-vested [employer] basic and matching contributions may be used to reduce future [employer] contributions, to pay Plan expenses or to reinstate account balances for rehired employees in accordance with the terms of the Plan." *See* Auditor Report attached to 2023 Form 5500 at 8;

### *The Plan's Investments*

72. The Plan's assets under management for all funds as of December 31, 2023 was $2,303,296,181. *See* 2023 Form 5500, Schedule H.

22

*Payment of Plan Expenses*

73. During the Class Period, administrative expenses were paid for by the Plan and/or the Company. *See* 2023 Auditor Report attached to 2023 Form 5500 at 11.

## VII. THE TOTALITY OF CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A. Overview

#### 1. ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments

74. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

75. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741. As noted above, these fiduciary duties are the highest known to law. *Sweda*, 923 F.3d at 333.

23

76.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

77.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes and any investment policy statements. This request was made on November 16, 2023. By letter dated January 8, 2024, Novo Nordisk did not produce meeting minutes or investment policy statements, to the extent they even exist.

78.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or

can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

79.    Further, under ERISA, an investment policy statement becomes part of the legal document governing a plan and plan fiduciaries are obligated to follow it. *See Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241-42 (2d Cir. 1989). Investment policy statements in general provide, among other things, insight regarding plan fiduciaries responsibilities concerning the selection of a plan's funds, how the plan's funds are to be monitored, when and how the plan's funds are to be removed and/or replaced with better performing funds.

80.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement*, *Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

81.    For purposes of this Complaint, given Plaintiffs' lack of access to meeting minutes or investment policy statements, to the extent they exist, Plaintiffs

25

have drawn reasonable inferences regarding the Plan fiduciaries' processes and methods based upon several factors as described herein.

82.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…" DOL 408(b)(2) Regulation Fact Sheet.

83.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

84.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

85.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

86.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

87.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

88.     The specific methodologies used to select prudent investments are primarily data driven. Such data is provided by investment research companies like Morningstar, which is the most accepted source of investment performance information, as it has the most robust information on mutual funds, CITs, and other types of investments. Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

89. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

90. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.")

### 2. The Target Date Funds in the Plan

91. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Schwab Target Date Funds.

92. Target date series are a staple in every defined contribution plan. Although no two target date series are identical, the general strategy, underlying investments, and risk profile is the same across all target date series: "[a] target-date fund is a fund of funds that provides asset-class diversity through a blend of stocks and bonds. Portfolios are adjusted for lower risk as they approach a designated target date" of retirement. https://www.morningstar.com/investing-definitions/target-date-funds-.[7] The subtle differences between series are what makes them more or less

---

[7] Last referenced September 5, 2024.

prudent than others, especially in terms of performance predictability.

93.    Target date series "provide a valuable service to investors by relieving them of the need to manage their portfolios themselves." *Id*. Thus, target date series are an important set-it-and-forget it option for less savvy investors relying on their plan fiduciaries to select a prudent series for their plan.

94.    At the start of the Class Period the Plan held more than $268 million dollars in the Schwab Target Date Series. *See* 2018 Auditor Report at 15. By 2023, the amount invested had reached over $538 million dollars. *See* Independent Auditor's Report attached to 2018 Form 5500 at 15. With such a large amount invested in the Schwab Target Date Series, the Plan would have been able to choose virtually any available target date funds for the Plan by the start of the Class Period.

95.    Indeed, there was no shortage of prudent choices. Beginning in 1994, the market for target date funds exploded with numerous investment managers offering a variety of different target date funds (both mutual funds and CITs alike).

96.    By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

97.    Established target date investment managers include, but are not limited to, American Funds, Callan GlidePath Funds, MFS Lifetime Funds and T.Rowe Price. T.Rowe has offered target date funds for more than 20 years while American

29

Funds and MFS have offered target date funds for approximately 15 years, providing stable investment returns to 401(k) plan participants. The T.Rowe Price Retirement Target Date Series, the American Funds Target Date R6 Series, the Callan GlidePath Target Date Series and MFS Target Date Series will all be referred to as the "Comparator Funds."

98.     The Comparator Funds are grouped in the same Morningstar Category as the Schwab Target Date Series. Morningstar Categories group funds "according to their actual investment style, not merely their stated investment objectives, nor their ability to generate a certain level of income. To ensure homogeneous groupings, Morningstar normally allocates funds to categories on the basis of their portfolio holdings. Several portfolios are taken into account to ensure that the fund's real investment stance is taken into account." *See* https://www.morningstar.co.uk/uk/glossary/98381/morningstar-category.aspx[8]

99.     Morningstar categories are more reliable than simply comparing fund prospectuses, because Morningstar is a third party providing neutral information. Meanwhile, "the investment objective stated in a fund's prospectus may or may not reflect how the fund actually invests, the Morningstar category is assigned based on the underlying securities in each portfolio. Morningstar categories help investors and

---

[8] Last accessed September 5, 2024.

investment professionals make meaningful comparisons between funds." *See* https://sg.morningstar.com/sg/news/115635/morningstar-category-definition.aspx[9]

100. As relevant here, Schwab Target Date Series are the only target date investing options in the Plan. In other words, participants in the Plan who want to invest in a target date strategy have no choice other than the Schwab Target Date Series.

101. Defendants, in particular, the Committee, were obligated under ERISA to carefully evaluate the Schwab Target Date Series before selecting them for inclusion in the Plan. The Committee was also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the Schwab Managed Retirement Target Date Series on an ongoing basis thereafter.

**B. The Plan's Fiduciaries Failed to Adequately Monitor and Remove the Schwab Target Date Series as It Significantly Underperformed Its Peers and Benchmarks**

102. Prior to the start of the Class Period, the Schwab Target Date Funds underperformed its peers and its Morningstar benchmark. Taking the 2040 Target Date as an example, since at least 2015 the Schwab Target Date Funds underperformed on a 3- and 5- year average basis.

103. Industry experts have concluded that the three- and five-year period is the most appropriate timeframe for evaluating investment performance, because it

---

[9] Last accessed September 5, 2024.

covers a full market cycle. *See* The PNC Financial Services Group, Inc., Assembling a Robust Investment Policy Statement for Endowments and Foundations, June 17, 2021 (a "fund's investment performance should be reviewed regularly, such as on an annual basis; however, the emphasis with regard to performance should be focused on results achieved over a full market cycle (typically a three-to-five year period)"). Available at: https://www.pnc.com/insights/corporate-institutional/manage-assets/assembling-a-robust-investment-policy-statement-for-endowments-foundations.html[10]

104. The Schwab Target Date Funds consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals (*i.e.*, three-to-five year periods and against Morningstar Category funds). Based on the below data, there's no justifiable reason why this fund would have been permitted to continue to languish in the Plan, unheeded, during the Class Period.

105. As seen in the chart below, the Schwab Target Date Series underperformed compared to its Morningstar benchmark on a 3- and 5- year average basis before the start of the Class Period and continued to underperform throughout the Class Period.

---

[10] Last accessed September 5, 2024.

| Investment and Benchmark | 3 Year Return 1/1/2016-12/31/2018 | 5 Year Return 1/1/2016-12/31/2020 |
|---|---|---|
| **US SA Target-Date 2000-2010** | | |
| Schwab Managed Retirement Tr Fd 2010 V | 4.03 | 7.63 |
| Schwab Managed Retirement Tr Fd 2010 VI | 3.52 | 7.32 |
| Benchmark 1: Morningstar Lifetime Mod 2010 TR USD | 4.47 | 7.93 |
| Benchmark 2: Morningstar Lifetime Mod 2010 TR USD | 4.47 | 7.93 |
| | | |
| **US SA Target-Date 2015** | | |
| Schwab Managed Retirement Tr Fd 2015 V | 4.13 | 7.86 |
| Schwab Managed Retirement Tr Fd 2015 VI | 3.63 | 7.55 |
| Benchmark 1: Morningstar Lifetime Mod 2015 TR USD | 4.79 | 8.56 |
| Benchmark 2: Morningstar Lifetime Mod 2015 TR USD | 4.79 | 8.56 |
| | | |
| **US SA Target-Date 2020** | | |
| Schwab Managed Retirement Tr Fd 2020 V | 4.80 | 8.48 |
| Schwab Managed Retirement Tr Fd 2020 VI | 4.29 | 8.17 |
| Benchmark 1: Morningstar Lifetime Mod 2020 TR USD | 5.18 | 9.20 |
| Benchmark 2: Morningstar Lifetime Mod 2020 TR USD | 5.18 | 9.20 |
| | | |
| **US SA Target-Date 2035** | | |
| Schwab Managed Retirement Tr Fd 2035 V | 5.97 | 10.89 |
| Schwab Managed Retirement Tr Fd 2035 VI | 5.44 | 10.57 |

| | | |
|---|---|---|
| Benchmark 1: Morningstar Lifetime Mod 2035 TR USD | 6.72 | 11.14 |
| Benchmark 2: Morningstar Lifetime Mod 2035 TR USD | 6.72 | 11.14 |
| | | |
| **US SA Target-Date 2040** | | |
| Schwab Managed Retirement Tr Fd 2040 V | 6.18 | 11.38 |
| Schwab Managed Retirement Tr Fd 2040 VI | 5.65 | 11.06 |
| Benchmark 1: Morningstar Lifetime Mod 2040 TR USD | 6.98 | 11.48 |
| Benchmark 2: Morningstar Lifetime Mod 2040 TR USD | 6.98 | 11.48 |

106.   This underperformance continued throughout the Class Period:

| | 5 Year Return (annualized) |
|---|---|
| **Investment and Benchmark[11]** | **1/1/2018-12/31/2022** |
| **US SA Target-Date 2000-2010** | |
| Schwab Managed Retirement Tr Fd 2010 V | 2.59 |
| Schwab Managed Retirement Tr Fd 2010 VI | 2.54 |
| Benchmark 1: Morningstar Lifetime Mod 2010 TR USD | 2.98 |
| Benchmark 2: Morningstar Lifetime Mod 2010 TR USD | 2.98 |
| | |
| | |
| **US SA Target-Date 2015** | |
| Schwab Managed Retirement Tr Fd 2015 V | 2.75 |
| Schwab Managed Retirement Tr Fd 2015 VI | 2.70 |
| Benchmark 1: Morningstar Lifetime Mod 2015 TR USD | 2.95 |

---

[11] In 2021, the Schwab Funds were switched to Class VI.

| | |
|---|---|
| Benchmark 2: Morningstar Lifetime Mod 2015 TR USD | 2.95 |
| | |
| | |
| **US SA Target-Date 2020** | |
| Schwab Managed Retirement Tr Fd 2020 V | 2.84 |
| Schwab Managed Retirement Tr Fd 2020 VI | 2.79 |
| Benchmark 1: Morningstar Lifetime Mod 2020 TR USD | 3.02 |
| Benchmark 2: Morningstar Lifetime Mod 2020 TR USD | 3.02 |
| | |
| **US SA Target-Date 2040** | |
| Schwab Managed Retirement Tr Fd 2040 V | 4.37 |
| Schwab Managed Retirement Tr Fd 2040 VI | 4.32 |
| Benchmark 1: Morningstar Lifetime Mod 2040 TR USD | 4.36 |
| Benchmark 2: Morningstar Lifetime Mod 2040 TR USD | 4.36 |

107.   Not only did the Schwab Target Date Funds underperform against their benchmark during the Class Period, but they also underperformed against their readily available alternative suites. The below chart shows that, in 2022, the 2010-2060 vintages of the Schwab Target Date Funds underperformed against each Comparator Funds' corresponding vintage in 35 out of 36 instances:

| Schwab TDFs and Comparator Funds by Vintage | 1/1/2022- 12/31/2022 Returns |
|---|---|
| | |
| Schwab Managed Retirement Tr Fd 2010 V | -14.28 |

| | |
|---|---:|
| T. Rowe Price Retirement 2010 Tr-A | -13.87 |
| American Funds 2010 Trgt Date Retire R6 | -9.15 |
| | |
| US SA Target-Date 2015 | |
| Schwab Managed Retirement Tr Fd 2015 V | -14.57 |
| | |
| Callan GlidePath® 2015 Fund CL Z | -11.01 |
| T. Rowe Price Retirement 2015 Tr-A | -14.12 |
| American Funds 2015 Trgt Date Retire R6 | -10.25 |
| | |
| US SA Target-Date 2020 | |
| Schwab Managed Retirement Tr Fd 2020 V | -14.85 |
| | |
| Callan GlidePath® 2020 Fund CL Z | -11.66 |
| T. Rowe Price Retirement 2020 Tr-A | -14.55 |
| American Funds 2020 Trgt Date Retire R6 | -11.01 |
| | |
| US SA Target-Date 2025 | |
| Schwab Managed Retirement Tr Fd 2025 V | -15.87 |
| | |
| Callan GlidePath® 2025 Fund CL Z | -12.58 |
| T. Rowe Price Retirement 2025 Tr-A | -15.55 |
| American Funds 2025 Trgt Date Retire R6 | -12.74 |
| MFS Lifetime 2025 R6 | -12.23 |
| | |
| US SA Target-Date 2030 | |
| Schwab Managed Retirement Tr Fd 2030 V | -16.90 |
| | |
| Callan GlidePath® 2030 Fund CL Z | -13.59 |
| T. Rowe Price Retirement 2030 Tr-A | -16.83 |

36

| | |
|---|---|
| American Funds 2030 Trgt Date Retire R6 | -14.50 |
| MFS Lifetime 2030 R6 | -13.66 |
| | |
| US SA Target-Date 2035 | |
| Schwab Managed Retirement Tr Fd 2035 V | -17.65 |
| | |
| Callan GlidePath® 2035 Fund CL Z | -14.37 |
| T. Rowe Price Retirement 2035 Tr-A | -17.77 |
| American Funds 2035 Trgt Date Retire R6 | -16.24 |
| MFS Lifetime 2035 R6 | -14.69 |
| | |
| US SA Target-Date 2045 | |
| Schwab Managed Retirement Tr Fd 2045 V | -18.94 |
| | |
| Callan GlidePath® 2045 Fund CL Z | -15.40 |
| T. Rowe Price Retirement 2045 Tr-A | -18.74 |
| American Funds 2045 Trgt Date Retire R6 | -18.18 |
| MFS Lifetime 2045 R6 | -15.37 |
| | |
| US SA Target-Date 2050 | |
| Schwab Managed Retirement Tr Fd 2050 V | -19.37 |
| | |
| Callan GlidePath® 2050 Fund CL Z | -15.56 |
| T. Rowe Price Retirement 2050 Tr-A | -18.83 |
| American Funds 2050 Trgt Date Retire R6 | -18.89 |
| MFS Lifetime 2050 R6 | -15.53 |
| | |
| US SA Target-Date 2055 | |
| Schwab Managed Retirement Tr Fd 2055 V | -19.51 |
| | |
| Callan GlidePath® 2055 Fund CL Z | -15.55 |

37

| | |
|---|---|
| T. Rowe Price Retirement 2055 Tr-A | -18.92 |
| American Funds 2055 Trgt Date Retire R6 | -19.50 |
| MFS Lifetime 2055 R6 | -15.44 |
| | |
| US SA Target-Date 2060 | |
| Schwab Managed Retirement Tr Fd 2060 V | -19.71 |
| | |
| Callan GlidePath® 2060 Fund CL Z | -15.54 |
| T. Rowe Price Retirement 2060 Tr-A | -18.95 |
| American Funds 2060 Trgt Date Retire R6 | -19.66 |
| MFS Lifetime 2060 R6 | -15.61 |

108. Together, these three charts span from the first day of 2016 until the last day of 2022, demonstrating that the Schwab Target Date Series underperformed in both good markets and bad markets.

109. Critically, the above charts include the 2010, 2015, and 2020 vintages, and the data points demonstrate that underperformance occurred after those vintages' target dates had passed. This means two things: (1) underperformance cannot be excused as a long-term strategy where better returns would materialize further in the future; and (2) retirees relying on these investment vintages would have received more financial support from other target date series' same vintages.

110. Looking at this data together, we can see that the Schwab Target Date Funds underperformed across several metrics for *years before* the Class Period, and for *years into* the Class Period. This consistent underperformance data was publicly available to the Committee at the time of their decision-making, whether they

38

reviewed the funds annually or quarterly (if at all). Prudent fiduciaries would have acknowledged that this pattern of underperformance did not bode well for the Schwab Target Date Funds' future performance and would have made a timely switch to any of the numerous safer, better managed, and ultimately more optimistic target date series.

111.   Given the long history of underperformance, it's inexplicable why the Schwab Target Date Series would have been included as a Plan investment option by the start of the Class Period and kept in place.

**C.     The Plan's Fees During the Class Period were Unreasonable**

112.   "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

**1.     ERISA's Fee Disclosure Rule**

113.   In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly

39

known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [12]

114. The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such a contract or arrangement.

115. For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

---

[12] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

116. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

117. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

118. Instead, plan administrators have a separate obligation under 29 CFR § 2550, 404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

### 2. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

119. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

120. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as

part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.    Recordkeeping;

B.    Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.    Administrative services related to converting a plan from one recordkeeper to another;

D.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.    Maintenance of an employer stock fund (if needed);

F.    Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.    Plan consulting services, including assistance in selecting the investment lineup offered to participants;

**H.**  Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s (excluding the separate fee charged by an independent third-party auditor);

**I.**  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

**J.**  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

121.  This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

122.  The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account

balance. These A La Carte services typically include, but are not limited to, the following:

A. Loan processing;

B. Brokerage services/account maintenance (if offered by the plan);

C. Distribution services; and

D. Processing of qualified domestic relations orders.

123. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

124. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[13] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more

_____

[13] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[14]

125.   In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

126.   Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

---

[14] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

45

127.   Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

128.   The incremental costs caused by additional participants may include: mailing costs, if materials are delivered by mail versus Internet; telephone inquiries through an 800 number; check distributions from the 401(k) plan to the participant; and/or any in person or off line participant education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

129.   Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

### 3. Much of the Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Plan Fiduciaries

130.   A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

46

131.    More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

132.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[15]

133.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

134.    Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe at minimum the fiduciary topics discussed and the rationale for resulting decisions. Any related documents or data considered

---

[15] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

for purposes of the fiduciary review (*e.g.*, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Plaintiffs asked pre-suit for meeting minutes which the Plan administrator did not provide.

135. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

136. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and recordkeeping fees which wasted the assets of the Plan and the assets of participants.

> **4.** **Circumstantial Facts and Evidence Plausibly Show that the Plan Paid Unreasonable Recordkeeping Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**

> **a.** **The Plan's Recordkeepers Offered Routine Services**

137. The RKA services performed each year by Schwab Retirement Plan Services for the Plan during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 15, 26, 50, and 64. Below is a description of the recordkeeping codes:

15 – Recordkeeping and information management (computing, tabulating, data processing etc.)

26 – Investment Advisory (participants)

50 – Direct payment from the plan

64 – Recordkeeping fees

*See* Instructions for the 2022 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2022-instructions.pdf at 25-29. Again, the above services are not out of the ordinary from the services other national recordkeepers provide. Any fees associated with other ancillary a la carte services performed by the Recordkeepers would be negligible because they are on a participant-by-participant basis instead of plan-wide.

> **b.    There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period**

138.    As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct an RFP.

49

139.   Here, based on the fact that the Plan paid relatively the same amount in recordkeeping fees from 2016 to 2020, there is little to suggest that Defendants conducted a RFP, or at least an effective one, at reasonable intervals to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. Below are some of the top recordkeeping providers in the country that RFPs could have been sent to:

### 2020 TOP PROVIDERS (RECORDKEEPERS)[16]

### Top 10, by Total 401(k) Assets ($MM)

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

---

[16] *See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/*

140.    These recordkeepers are capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.  Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

      **c.    The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

141.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

142.    As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

143.    The Plan's per participant RKA fees were as follows:

| Plan Year | Participants | Total RKA Reported[17] | $PP |
|---|---|---|---|
| **2018** | 7,813 | $84,119 | $10.77 |

---

[17] To keep the total fees consistent with the comparator plans analyzed below, the total fee was determined by adding any amounts reported on Schedule C of the Plan's 5500s which are reported as either direct or indirect costs and which are coded in the categories discussed above as common RKA coding which include but are not limited to 13, 14, 15, 16, 37, 50, 60, 62, 64 and 65. Excluded

| Plan Year | Participants | Total RKA Reported[17] | $PP |
|---|---|---|---|
| **2019** | 7,760 | $401,945 | $51.80 |
| **2020** | 8,568 | $440,310 | $51.39 |
| **2021** | 8,060 | $559,845 | $69.46 |
| **2022** | 9,147 | $592,207 | $64.74 |
| **2023** | 10,201 | $686,460 | $67.29 |

144. Except for Plan year 2018, the above fees were astronomical when benchmarked against similar plans. Indeed, the fact that RKA fees jumped five-fold from 2018 to 2019 when the number of Plan participants remained static, is a clear indication of imprudent conduct on the part of the Plan's fiduciaries.

145. From 2019 through 2023, the Plan had a low of approximately 7,760 total participants in 2019 to a high of 10,301 total participants in 2023 making it eligible for some of the lowest fees on the market.

146. As discussed above, the recordkeeping was performed throughout the Class Period by Schwab Retirement Plan Services.

147. The leading publication that collects 401(k) data, BrightScope/ICI, categorizes plans in the following tranches:

---

from these amounts are any amounts reported as, including but not limited to, legal, accounting and/or consulting fees. Although no indirect costs are reported it is expected that once the total amount of revenue sharing is known this amount will increase.

EXHIBIT I.2

**Universe of 401(k) Plans**

Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2018

| Plan assets | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Less than $1M | 343,108 | 58.5% | 6,007.5 | 8.4% | $107.1 | 2.1% |
| $1M to $10M | 208,789 | 35.6 | 13,660.6 | 19.1 | 620.7 | 12.2 |
| >$10M to $50M | 26,458 | 4.5 | 9,894.5 | 13.9 | 532.4 | 10.4 |
| >$50M to $100M | 3,564 | 0.6 | 4,808.0 | 6.7 | 247.1 | 4.8 |
| >$100M to $250M | 2,407 | 0.4 | 6,744.8 | 9.5 | 374.7 | 7.3 |
| >$250M to $500M | 1,034 | 0.2 | 5,395.1 | 7.6 | 362.1 | 7.1 |
| >$500M to $1B | 603 | 0.1 | 4,763.9 | 6.7 | 424.1 | 8.3 |
| More than $1B | 659 | 0.1 | 20,073.4 | 28.1 | 2,439.7 | 47.8 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

| Number of plan participants | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Fewer than 100 | 522,277 | 89.0% | 10,960.2 | 15.4% | $709.2 | 13.9% |
| 100 to 499 | 50,477 | 8.6 | 9,841.2 | 13.8 | 549.9 | 10.8 |
| 500 to 999 | 6,375 | 1.1 | 4,424.5 | 6.2 | 266.1 | 5.2 |
| 1,000 to 4,999 | 5,807 | 1.0 | 12,136.0 | 17.0 | 886.3 | 17.4 |
| 5,000 to 9,999 | 842 | 0.1 | 5,828.1 | 8.2 | 506.0 | 9.9 |
| 10,000 or more | 844 | 0.1 | 28,157.8 | 39.5 | 2,190.4 | 42.9 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.

Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

148.   Based on the above chart, the billion-dollar asset mark is significant as all plans over a billion dollars are considered a category of their own.

149.   Looking at recordkeeping costs for plans of a similar size during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets > $1b | Assets < $1b | Participants | Cost per participant [18] |
|---|---|---|---|---|---|---|
| Vanguard | Crowe LLP Retirement Plan | 2022 | | $992,984,046 | 7,584 | $26 |
| T. Rowe Price | Expeditors International of Washington, Inc. 401(k) Plan | 2022 | | $839,061,386 | 9,597 | $31 |
| | **Novo Nordisk Plan** | **2022** | **$1,769,202,694** | | **9,147** | **$64.74** |
| Empower | Smithfield Foods, Inc. Salaried 401(k) Plan | 2021 | | $695,539,380 | 6,124 | $46 |
| | **Novo Nordisk Plan** | **2021** | **$1,769,202,694** | | **9,147** | **$64.74** |
| Vanguard | Michelin 401(k) Savings Plan | 2020 | Yes | | 15,880 | $34 |
| Fidelity | Ecolab Savings Plan and ESOP | 2020 | Yes | | 17886 | $34 |
| | **Novo Nordisk Plan** | **2020** | **$1,995,021,356** | | **8,568** | **$51.39** |
| Fidelity | Fortive Retirement Savings Plan | 2019 | Yes | | 14,375 | $38 |

[18] Unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | |
|---|---|---|---|---|---|---|
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2019 | Yes | | 14,676 | $37 |
| Great-West | Penn State Health 401(k) Savings Plan | 2019 | Yes | | 15,020 | $35 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | Yes | | 15,246 | $35 |
| | **Novo Nordisk Plan** | **2019** | **$1,489,151,588** | | **7,760** | **$51.80** |

150.   The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees.

151.   As of the end of 2020 there were only 892 (0.1%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plan's $59.35 average per participant fee from 2019 to 2022 is almost two times the average fee of $35 per participant from 2019 to 2022 for the nine (9) plans listed above.

152.   This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2023. Indeed, the figures in the above

chart are just an example of the Plan's excessive RKA fees as the Plan had an average of $60.94 per participant fee from 2019 through 2023.

153.    Additionally, to further illustrate the excessiveness of the Plan RKA costs, numerous plans during the Class Period that were smaller in assets and had similar sizes in participants, and thus lacking the bargaining leverage of the Plan, paid less in RKA costs:

| Plan Name | Plan Year | Number of Participants | Assets Under Management | RKA Costs on Per-Participant Basis[19] | Record-keeper |
|---|---|---|---|---|---|
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 2018 | 10,770 | $773,795,904 | $31 | Vanguard |
| Vibra Healthcare Retirement Plan | 2018 | 9,750 | $107,652,510 | $28 | Great-West |
| Ralph Lauren 401(k) Plan | 2018 | 9,389 | $552,586,935 | $31 | T. Rowe Price |

---

[19] In order to keep this comparator analysis consistent with the Novo Nordisk Plan analysis above, RKA costs in the chart are derived, in the same manner as for Novo Nordisk, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as 13, 14, 15, 16, 37, 50, 60, 62, 64 and 65 are some examples, but are not limited to, these codes. See Instructions for Form 5500 (2020) at pg. 27 (defining each service code),            https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf   at  27.  In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

| Plan Name | Plan Year | Number of Participants | Assets Under Management | RKA Costs on Per-Participant Basis[20] | Record-keeper |
|---|---|---|---|---|---|
| Children's Medical Center of Dallas Employee Savings Plan 403(b) | 2018 | 9,356 | $349,335,673 | **$36** | Fidelity |
| Bausch Health Companies Inc. Retirement Savings Plan | 2018 | 8,902 | $904,717,349 | **$36** | Fidelity |
| Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | 14,698 | $435,391,716 | **$23** | Fidelity |
| Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | 10,072 | $843,224,007 | **$22** | Fidelity |

154. Thus, the Plan, with over 7,700 participants and over $1.2 billion dollars in assets in 2019, should have been able to negotiate recordkeeping costs in

---

[20] In order to keep this comparator analysis consistent with the Novo Nordisk Plan analysis above, RKA costs in the chart are derived, in the same manner as for Novo Nordisk, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as 13, 14, 15, 16, 37, 50, 60, 62, 64 and 65 are some examples, but are not limited to, these codes. See Instructions for Form 5500 (2020) at pg. 27 (defining each service code), https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

the $35 per participant range from the beginning of the Class Period to the present. Anything above that would be an outlier, especially later in the Class Period when RKA costs per participant should have been at the cheapest.

155. Further, because Schwab Retirement Plan Services received income from the funds it maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration in considering whether RKA fees paid to Schwab were reasonable. When considered together, the fees being paid to Schwab were clearly unreasonable.

156. The $35 range is not an exact rate that every Plan participant should have paid. To the extent Defendants collected recordkeeping fees through an asset-based percentage fee, the amount participants paid for recordkeeping fees was a function of a percentage level and the assets in each participant's account. Meaning, the actual amounts paid by Plan participants varied according to the assets in their accounts.

157. A lower dollar amount paid in fees is primarily reflective of a low balance in the participant's account. Therefore, if the average per participant fee was reduced to the $35 range, the pro rata rates for all participants, including those that were paying less than the $35 range, would drop proportionally according to the level of assets in their accounts.

158.  Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### E. The Company Improperly Reduced its Plan Contributions Through Forfeiture Accounts

159.  A Trust, adopted by Novo Nordisk under a trust agreement between Novo Nordisk and the trustee, was "established to hold and invest contributions made under the Plan." Plan Doc. at 12. Accordingly, all contributions to the Trust consist of Plan assets.

160.  During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Defendants' own benefit and to the detriment of Plan participants.

161.  As explained above, any contributions in the Trust which do not vest, or which are not claimed by a Plan participant, are forfeited.

162.  As alleged above, Defendants had a choice on how to utilize forfeited amounts. Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-vested Plan assets for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit Plan participants.

163. According to information from the Plan's Form 5500, the following represents the balance in the Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset Novo Nordisk's contributions to the Plan, and the amounts used to pay for Plan administration costs:

| Year | Forfeiture Balance | Amts. Used to Offset Employer Contributions | Amts Used to Pay Admin Costs |
|---|---|---|---|
| 2018 | $37,000 | $795,000 | $0 |
| 2019 | $84,000 | $559,000 | $0 |
| 2020 | $212,000 | $634,000 | $0 |
| 2021 | $115,000 | $1,031,000 | $11,000 |
| 2022 | $18,000 | $2,438,000 | $31,000 |
| 2023 | $758,000 | $747,000 | $0 |
| Total | | $6,204,000.00 | $42,000.00 |

164. Based on the above chart, from the beginning of the Class Period through 2023, $6.2 million was improperly steered from paying RKA costs and instead used to benefit the Company.

165. Defendants effectively placed their own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating forfeited funds to Plan participants' accounts, and also caused Plan participants to incur at least $6.2 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

166. Additionally, based on the fact that from 2018 through 2022 the amount of offset exceeded the balance of the forfeiture account, it is likely the Company used forfeiture funds from prior years to offset Company contributions. This is a

violation of IRS and general ERISA requirement that forfeitures are to be exhausted during the year in which they are incurred.

## COUNT I
### Breach of Fiduciary Duty of Prudence
### (Asserted against the Committee)

167. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

168. At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

169. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

170. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint, including mismanagement of

61

investment funds and failing to control the costs of the Plan's recordkeeping and administrative costs.

171. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

172. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

173. The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Breach of Fiduciary Duty of Loyalty**
**(Asserted against the Company, the Committee and Board Defendants)**

174. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

175. At all relevant times, the Company, the Committee and its members during the Class Period, and the Board and its members during the Class Period ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

176. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

177. Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendants were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

178. The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

63

179.   The Loyalty Defendants used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

180.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

181.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

182.   Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT III**
**Breach of ERISA's Anti-Inurement Provision**
**(Asserted against Novo Nordisk and the Board Defendants)**

183.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

184.   Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of

64

providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

185. Because all forfeited Plan participant funds are initially placed in the Plan's trust, these forfeited funds are Plan assets.

186. The Companies' use of the forfeited funds to defray its own contributions to the Plan in order to save itself millions of dollars in funds that the Company would otherwise have to contribute to the Plan, caused the assets of the Plan to inure to the benefit of the Company in violation of 29 U.S.C. § 1103(c)(1).

187. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

188. Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT IV
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Novo Nordisk and the Board Defendants)

189. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

65

190. Novo Nordisk and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

191. In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

192. The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendants.

193. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions, including with

respect to allowing the Company to use forfeited funds to pay for Plan RKA services; and

(b)    failing to remove Committee members whose performance was inadequate in that they continued to maintain excessive RKA costs, all to the detriment of the Plan and Plan's participants' retirement savings.

194.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

195.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as a Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: September 13, 2024            **CAPOZZI ADLER, P.C.**

                                    */s/ Mark K. Gyandoh*
                                    Mark K. Gyandoh, Esquire
                                    New Jersey Bar No. 025622001
                                    James A. Maro, Esquire

69

New Jersey Bar No. 017052000
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
        jamesm@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*

70