# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN FUMICH, LAURA MISCHLEY, RAPHAEL HINTON, RONNIE MCLEAN, and THOMAS CHAFFIN, individually and on behalf of all others similarly situated, )))))))  Plaintiffs,  v. )))) | Civil Action No. 24-9158 (ZNQ) (JBD) |

JOHN FUMICH, LAURA
MISCHLEY, RAPHAEL HINTON,   )
RONNIE MCLEAN, and THOMAS   )    **Civil Action No. 24-9158 (ZNQ) (JBD)**
CHAFFIN, individually and on
behalf of all others similarly
situated,

              Plaintiffs,
      v.

NOVO NORDISK INC., THE
BOARD OF DIRECTORS OF
NOVO NORDISK INC., THE
NOVO NORDISK INC.
RETIREMENT COMMITTEE, and
JOHN DOES 1- 30,

              Defendants.

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs John Fumich, Laura Mischley, Raphael Hinton, Ronnie McLean,

Thomas Chaffin, and Christopher Lichok ("Plaintiffs"), by and through their

attorneys, on behalf of the Novo Nordisk Inc. 401(k) Savings Plan (the "Plan"),[1]

themselves and all others similarly situated, state and allege as follows:

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

1

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Novo Nordisk Inc. ("Novo Nordisk" or the "Company"), the Board of Directors of Novo Nordisk Inc. and its members (the "Board") during the Class Period[2] and the Novo Nordisk Inc. Retirement Committee and its members (the "Committee") during the Class Period.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.    The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they

---

[2] As discussed in more detail below, the Class Period is defined as September 13, 2018 through the date of judgment ("Class Period").

2

continue to be appropriate choices." *See* "*A Look at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

6.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.    The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

8.    At all times during the Class Period, the Plan had at least $1.2 billion dollars in assets under management. The Plan's assets under management for all funds as of December 31, 2018 was $1,222,746,393 and by 2024 the assets under management had risen to $2,538,744,944. *See* 2018 Form 5500 of the Novo Nordisk Inc. 401(k) Savings Plan ("2018 Form 5500"), Schedule H and 2024 Form 5500 of the Novo Nordisk Inc. 401(k) Savings Plan ("2024 Form 5500"), Schedule H, respectively.

9.    In 2018, plans with over $1 billion in assets made up only 0.1 percent (659 of 586,622) of all plans in the United States.[3]

10.    The same was true in 2022 as plans with over $1 billion is assets made up only 0.1 percent (852 of 684,970) of all plans in the United States.[4]

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

11.     The Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plan had substantial bargaining power to obtain the most cost-efficient investments. Defendants, however, did not exercise appropriate judgment in scrutinizing each investment option, initially and on an ongoing basis, that was offered in the Plan to ensure it was prudent.

12.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 7,813 participants. *See* 2018 Form 5500, at 2. By 2024, the Plan had 11,252 participants. *See* 2024 Form 5500 for the Plan, at 2.

13.     Defendants caused the Plan to enter into an arrangement with Schwab Retirement Plan Services ("Schwab"), under which Schwab received millions of dollars in exchange for recordkeeping services rendered to the Plan, and with Charles Schwab Trust Company, a division of Charles Schwab Bank, for trustee services. Schwab and Charles Schwab Bank are affiliated companies under Charles Schwab & Co.[5] Defendants' conduct was especially egregious given that Charles Schwab Bank received additional income from certain of the Plan's investment securities. This arrangement with Schwab is a prohibited transaction because it

---

[5] *See* Independent Auditors' Report ("Auditors' Report"), attached to 2024 Form 5500, at Note 5 – Related Party and Party-in-Interest Transactions, p. 13 ("Schwab Retirement Plan Services is the recordkeeper of the Plan. Furthermore, Schwab Retirement Plan Services and Charles Schwab Bank are affiliated companies under Charles Schwab & Co.").

amounts to "a direct or indirect ... furnishing of services ... between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C)." *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 514 (D.N.J. 2021).

14. During the putative Class Period, Defendants, as the "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

15. Plaintiffs further allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; (2) failing to control the Plan's Recordkeeping and Administrative ("RKA"); and (3) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

16. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

17.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and violations of ERISA's prohibited transactions (Count III).

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

19.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

20.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     THE PLAN'S INVESTMENTS

21.    Several investments were available to Plan participants as investment options each year during the putative Class Period.

22.    At the beginning of 2018 to at least year-end 2024, the Plan's assets included the Schwab Managed Retirement Target Date Funds in the V and VI share classes. *See* Auditors' Report attached to 2018 Form 5500, at 16 and Auditors' Report attached to 2024 Form 5500, at 15.

23.    Target date funds are designed to provide a single diversified investment vehicle for plan participants. The target date refers to the participant's expected retirement year. For example, "target date 2040" investments are designed for individuals who intend to retire in 2040.

24.    The Schwab Managed Retirement Target Date Funds are not mutual funds, but collective investment trusts ("CITs"). A CIT is a tax-exempt, pooled investment vehicle available only to qualified retirement plans and certain governmental retirement plans (as defined in Internal Revenue Code Section 414(d)). Many CITs, like the Schwab Managed Retirement Target Date Funds, have a similar structure to mutual funds.

25.    Schwab has offered target date funds dating as far back as several years before the start of the Class Period. The V share class was not available until August 25, 2016. On June 17, 2021, pursuant to an amendment to the SchwabPlan™ Services Agreement effective January 1, 1999, the Schwab Managed Retirement

Target Date Funds VI share class was added to the Plan and the assets in the V class were replaced and transferred to the VI class. *See* Amendment to the SchwabPlan™ Services Agreement between Novo Nordisk Inc. and Charles Schwab & Co., Inc., dated June 17, 2021.

26. For ease of reference, each iteration of the Schwab Managed Retirement Target Date Funds, whether V or VI share classes, will be referred to herein as the "Schwab Target Date Funds" or "Schwab TDFs" where applicable.

27. Lastly, the Schwab Target Date Funds corresponding with the various target years, *e.g.,* 2030, 2035, 2040, *etc*, are referred to collectively herein as the "Schwab Target Date Series."

## IV.   PARTIES

### Plaintiffs

28. Plaintiff, John Fumich ("Fumich"), resides in Morgantown, West Virginia. During his employment, Plaintiff Fumich participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Fumich invested in the Schwab Target Date Funds, specifically the Schwab Managed Retirement Trust 2040 Cl V fund and suffered injury to his Plan account due to significant underperformance of the funds, including the 2040 fund. In addition, Plaintiff Fumich was subject to the excessive RKA costs. Plaintiff Fumich suffered injury to his Plan account by overpaying for his share of RKA costs.

29.     Plaintiff, Laura Mischley ("Mischley"), resides in Lakeland, Florida. During her employment, Plaintiff Mischley participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Mischley invested in the Schwab Target Date Funds, specifically the Schwab Managed Retirement Trust 2030 Cl V fund, the Schwab Managed Retirement Trust 2040 Cl V fund, the Schwab Managed Retirement Trust 2030 Cl VI fund, and the Schwab Managed Retirement Trust 2040 Cl VI fund and suffered injury to her Plan account due to significant underperformance of the funds, including the 2030 and 2040 funds. In addition, Plaintiff Mischley was subject to the excessive RKA costs. Plaintiff Mischley suffered injury to her Plan account by overpaying for her share of RKA costs.

30.     Plaintiff, Raphael Hinton ("Hinton"), resides in Wilson, North Carolina. During his employment, Plaintiff Hinton participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Hinton suffered injury to his Plan account by overpaying for his share of RKA costs.

31.     Plaintiff, Ronnie McLean ("McLean"), resides in Garner, North Carolina. During her employment, Plaintiff McLean participated in the Plan paying the RKA costs associated with her Plan account and was subject to the excessive

10

RKA costs. McLean suffered injury to her Plan account by overpaying for her share of RKA costs.

32.     Plaintiff, Thomas Chaffin ("Chaffin"), resides in Roanoke, Virginia. During his employment, Plaintiff Chaffin participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Chaffin invested in the Schwab Target Date Funds, specifically the Schwab Managed Retirement Trust 2045 Cl VI fund and suffered injury to his Plan account due to significant underperformance of the funds, including the 2045 fund. In addition, Plaintiff Chaffin was subject to the excessive RKA costs. Plaintiff Chaffin suffered injury to his Plan account by overpaying for his share of RKA costs.

33.     Plaintiff, Christopher Lichok ("Lichok"), resides in Downingtown, Pennsylvania. During his employment, Plaintiff Lichok participated in the Plan investing in the options offered by the Plan and challenged in this lawsuit. Plaintiff Chaffin invested in the Schwab Target Date Funds, specifically the Schwab Managed Retirement Trust 2025 Cl V fund, and the Schwab Managed Retirement Trust 2030 Cl V Fund, and suffered injury to his Plan account due to significant underperformance of the funds, including the 2025 and 2030 funds. In addition, Plaintiff Lichok was subject to the excessive RKA costs. Plaintiff Lichok suffered injury to his Plan account by overpaying for his share of RKA costs.

11

34.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

35.     Plaintiffs did not have knowledge of all material facts (including, among other things, how target date funds in a retirement plan should perform as compared to their peers and benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

### Company Defendant

36.     Novo Nordisk is a named fiduciary of the Plan with a principal place of business at 800 Scudders Mill Rd, Plainsboro Township, New Jersey 08536. Novo Nordisk engages in the research and development, manufacture, and distribution of pharmaceutical products in Europe, the Middle East, Africa, Mainland China, Hong Kong, Taiwan, North America, and internationally.

37.     Novo Nordisk, directly or acting through its Board, appointed the Committee to, among other things, ensure that the investments available to the Plan's

participants are appropriate and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

38.    Accordingly, Novo Nordisk during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

39.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

40.    The Board appointed the Committee to, among other things, "to carry out the Company's responsibility to administer the Plan in accordance with the Charter of the Retirement Committee of the Company." Novo Nordisk Inc. 401(k) Savings Plan, Effective as of January 1, 2024, Document ("Plan Doc.") at 56. As noted above, under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

41.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

13

42.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

43.    The Committee's role is to "administer the Plan in accordance with its terms and the Charter of the Retirement Committee of the Company and shall have all the powers necessary to carry out the provisions of the Plan." Plan Doc. at 57.

44.    As administrator of the Plan, the Committee had "exclusive authority and discretion to direct the Trustee to establish one or more investment funds for the investment of the assets of the Trust Fund. Such investment funds may include, but need not be limited to, mutual funds managed by an investment company or companies selected by the Administrator." Plan Doc. at 54.

45.    Further, "[i]n directing the Trustee with respect to the investment funds for the investment of assets of the Trust fund, the Administrator shall use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. The Administrator may, at any time, direct that a new investment fund or funds be established and/or discontinue an existing investment fund or funds." Plan Doc. at 55.

14

46.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan's assets.

47.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

48.     To the extent that there are additional officers, employees and/or contractors of Novo Nordisk who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Novo Nordisk officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

V.     CLASS ACTION ALLEGATIONS[6]

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because

15

49.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Novo Nordisk Inc. 401(k) Savings Plan, at any time between September 13, 2018 through the date of judgment (the "Class Period").

50.    The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 11,252 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500, at 2.

51.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

16

52.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

- Whether Defendants are/were fiduciaries of the Plan;

- Whether Defendants breached their fiduciary duty of prudence and loyalty by engaging in the conduct described herein;

- Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

- The proper form of equitable and injunctive relief; and

- The proper measure of monetary relief.

53.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

54.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing

17

incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

55.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    THE PLAN

56.    The Plan is a defined contribution plan covering substantially all eligible employees of Novo Nordisk intended to provide retirement benefits to the employees. *See* Summary Plan Description for the Novo Nordisk Inc. 401(k) Savings Plan, effective January 1, 2024 ("SPD") at 4. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.

18

Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

57.     In general, the Plan covers all employees of Novo Nordisk. *See* SPD, at 4 ("If you are an eligible employee of an Employer, you are immediately eligible to participate in the Plan on your date of hire without the need to complete any period of service or to attain any age (regardless of the number of hours you work)").

58.     Unless an employee opts out of the automatic enrollment feature of the Plan, an employee will automatically be enrolled in the Plan after the sixty-day period following the employee's date of hire. *See* SPD, at 5 ("If you do not enroll in the Plan, Employee Pre-Tax Deferrals will begin to be made on your behalf through the Plan's automatic enrollment feature after the 60-day period following your date of hire has expired.").

59.     Temporary employees are eligible to participate in the Plan on the first day of the month after the employee completes 1,000 hours of service during the twelve-month period that begins on the date of hire. *See* SPD at 4 ("If you are a temporary employee, you are generally excluded from eligibility to participate in the Plan. However, you will become eligible to enter the Plan on the first day of the month after you complete 1,000 hours of service during the 12- month period that begins on your date of hire.").

19

*Contributions*

60.    Subject to limitations of the Internal Revenue Service and the Internal Revenue Code of 1986, as amended, there are several types of contributions that an employee can make to the plan, which are employee pre-tax contributions (including catch-up contributions), Roth 401(k) contributions (including catch-up contributions), and after-tax contributions. *See* Plan Doc. at 15; *see also* SPD at 7 ("There are three different contribution types you may elect to make to the Plan: Employee Pre-Tax Deferrals (including Catch-Up Contributions), Roth 401(k) Contributions (including Catch-Up Contributions), and After-Tax Contributions.").

61.    "In addition, as an eligible employee you may make qualified Rollover Contributions of amounts which you may have accumulated with another employer under another qualified retirement plan and/or individual retirement account (i.e., IRA)." SPD at 8.

62.    An employee may contribute up to 50% of the employee's compensation to the Plan as an employee pre-tax deferrals and Roth 401(k) contributions. *See id*. ("You may elect to contribute up to a total of 50% of your Compensation to the Plan as Employee Pre-Tax Deferrals and Roth 401(k) Contributions.").

63.    Further, an employee may contribute up to 15% of the employee's compensation to the plan as after-tax contributions. *See id*. ("In addition, you may

20

elect to contribute up to 15% of your Compensation to the Plan as After-Tax Contributions.").

64.     Novo Nordisk contributes a matching contribution that is equal to 50% of the first 2% of an employee's pre-tax contribution and Roth 401(k) contribution. *See id.* at 10 ("Employers provide a Matching Contribution in cash equal to 50% of the first 2% of your Employee Pre-Tax Deferral and Roth 401(k) Contributions, up to 2% of your Compensation.").

65.     An employee also receives a basic employer contribution, even if the employee does not elect to make pre-tax deferrals. The basic employer contribution is equal to 8% of an employee's compensation. *See id.* at 11 ("If you are an eligible employee who is actively employed by a Participating Affiliate, other than a Participating Affiliate that participates in the MPP, you are eligible to receive a Basic Employer Contribution equal to 8% of your Compensation as determined under the Plan, on a payroll by payroll basis.").

66.     Like other companies that sponsor 401(k) plans for their employees, Novo Nordisk enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

67.    Novo Nordisk's employees benefit in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

68.    Given the size of the Plan, Novo Nordisk likely enjoyed a significant tax and cost savings from offering a match.

*Accounts*

69.    For the different types of contributions made to the Plan, separate accounts are set up on the Participant's behalf, which include: employee pre-tax deferral account; matching contribution account; basic employer contribution account; after-tax contribution account; Roth 401(k) contribution account; Roth in-Plan account; and rollover account. *See* SPD at 8.

70.    "The Trustee of the Plan holds, invests and distributes the Plan assets, and invests your Account in accordance with your investment instructions." SPD, at 3.

## VII.  THE TOTALITY OF CIRCUMSTANCES DEMONSTRATES THAT THE PLAN'S FIDUCIARIES FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    Overview - ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology for Evaluating Investments

71.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

72.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741. As noted above, these fiduciary duties are the highest known to law. *Sweda*, 923 F.3d at 333.

73.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery.

74.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Plan administrator to request, among other things, the Committee's meeting minutes and any investment policy statements. This request was made on November 16, 2023. By letter dated January 8, 2024, Novo

Nordisk did not produce meeting minutes or investment policy statements, to the extent they even exist.

75.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

76.    Further, under ERISA, an investment policy statement becomes part of the legal document governing a plan and plan fiduciaries are obligated to follow it. *See Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241-42 (2d Cir. 1989). Investment policy statements in general provide, among other things, insight regarding plan fiduciaries responsibilities concerning the selection of a plan's funds, how the plan's funds are to be monitored, when and how the plan's funds are to be removed and/or replaced with better performing funds.

24

77. For purposes of this Complaint, given Plaintiffs' lack of access to meeting minutes or investment policy statements, to the extent they exist, Plaintiffs have drawn reasonable inferences regarding the Plan fiduciaries' processes and methods based upon several factors as described below.

78. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…" DOL 408(b)(2) Regulation Fact Sheet.

79. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

80. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

25

at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

81.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

82.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

83.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

84.     The specific methodologies used to select prudent investments are primarily data driven. Such data is provided by investment research companies like Morningstar, which is the most accepted source of investment performance information, as it has the most robust information on mutual funds, CITs, and other types of investments. Indeed, Morningstar is used and trusted by virtually all financial professionals and fiduciaries.

85.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

86.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

87.    Lastly, to the extent plan fiduciaries have adopted an investment policy statement, which does not appear to be the case here, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

88.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Schwab TDFs in the Plan throughout the Class Period that wasted the assets of the

27

Plan and the assets of participants because of unnecessary costs and underperformance.

B. **Defendants Breached Their Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Chronically Underperforming Schwab TDFs**

1. **The Plan's Inclusion of the Schwab TDFs**

89.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Schwab Target Date Funds.

90.     Defendants included in the Plan's menu of investment offerings the materially underperforming Schwab TDFs.

91.     Target date funds are designed to provided a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

92.     The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

93.     Although no two target date series are identical, the general strategy, underlying investments, and risk profile is the same across all target date series: "[a] target-date fund is a fund of funds that provides asset-class diversity through a blend of stocks and bonds. Portfolios are adjusted for lower risk as they approach a designated target date" of retirement. https://www.morningstar.com/investing-

28

definitions/target-date funds-. The subtle differences between series are what makes them more or less prudent than others, especially in terms of performance predictability.

94.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years or more.

95.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

96.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

97.     This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

98.     The target date refers to the participant's expected retirement year. For

29

example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

99.     Target date funds have been divided into two broad categories by some industry professionals based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

100.    The Schwab TDFs in the Plan were "through" funds.

101.    Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively managed funds. Because of this, passive or index funds charge a much lower investment

management fee and have a lower total "expense ratio" relative to active funds.[9]

102.    A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plan, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. *See* SPD, at 15 ("Failure to provide investment instructions for any contributions shall result in the investment of such funds in the Life Cycle Funds established under the Plan based upon your age. This is considered to be the Qualified Default Investment Alternative ("QDIA") under the Plan. As described above, if you are automatically enrolled in the Plan, your Employee Pre-Tax Deferral Account will be invested in the QDIA unless you indicate a different investment choice."). The use of a plan's target date funds as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

103.    A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. Here, the performance histories of the Schwab

---

[9] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

Target Date Series were mediocre when compared to their appropriate peer groups.

### 2.    Morningstar Benchmarks are Meaningful for Evaluating the Underperformance of the Schwab Target Date Series

104.    With respect to investment returns, as discussed above, diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

105.    Morningstar, the most well respected and accepted financial industry fund database has created the Morningstar Lifetime Moderate Index category as the index category for target date funds.

106.    A Morningstar Category is assigned by placing funds into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . .  Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id.*

107.    Further, as Morningstar states, it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found

32

that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[10] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

108.    Additionally, the measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

109.    By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

110.    Established target date fund investment managers include, but are not limited to, Callan GlidePath®, American Funds, T.Rowe Price and Mutual of America. American Funds and T.Rowe have each offered target date funds for nearly 20 years with Mutual of America's offering being closer to 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.

---

[10] Available at the following web address: https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on August 6, 2025.

111.    The T.Rowe Price Retirement Target Date A

112.    The T.Rowe Price Retirement Target Date A Series, the American Funds Target Date R6 Series, the Callan GlidePath® Target Date Cl Z Series, and the MFS Lifetime R6 Series will all be referred to as the "Comparator Funds."

113.    The Comparator Funds are grouped in the same Morningstar Category as the Schwab Target Date Series and are comparable based on several aspects:

*Underlying Holding and Management*

114.    The Schwab Target Date Series and each of the Comparator Funds are large blend style funds, per their Morningstar pages.

115.    "[N]o series is truly passively managed, as every target-date manager makes active decisions in building a glide path and selecting asset classes, sometimes tactically based on market outlooks." *See* https://www.morningstar.com/funds/1-trillion-target-date-fund-landscape.

   a.    Callan GlidePath® - The Callan GlidePath® target date funds pursue the same investment objectives as the Schwab Target Date funds, invest primarily in equity (stock) and fixed income (bond) securities as do the Schwab Target Date funds, invest in both U.S. and foreign securities as do the Schwab Target Date funds, utilize a "through" glide path as do the Schwab Target Date funds, are managed by well-known investment advisers, and are available to all large

34

retirement plans including the Plan.[11]

b.      T. Rowe Price - The T.Rowe Price target date funds pursue the same investment objectives as the Schwab Target Date funds, invest primarily in equity (stock) and fixed income (bond) securities as do the Schwab Target Date funds, invest in both U.S. and foreign securities as do the Schwab Target Date funds, utilize a "through" glide path as do the Schwab Target Date funds, are managed by well-known investment advisers, and are available to all large retirement plans including the Plan.[12]

c.      American Funds - The American Funds target date funds pursue the same investment objectives as the Schwab Target Date funds, invest primarily in equity (stock) and fixed income (bond) securities as do the Schwab Target Date funds, invest in both U.S. and foreign securities as do the Schwab Target Date funds, utilize a "through" glide path as do the Schwab Target Date funds, are managed by well-known investment advisers, and are available to all large retirement plans including the Plan.[13]

---

[11] *See* https://www.callan.com/target-date-index/ (last visited September 11, 2025).
[12] *See* T. Rowe Price Target Funds Brochure, *available at* https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/investments/target-date/Target_Funds_Brochure.pdf (last visited September 11, 2025).
[13] *See* American Funds Target Date Retirement Series Prospectus dated Jan. 1, 2025, *available at* https://capitalgroup.prospectus-

35

d.      MFS Lifetime - The MFS Lifetime Funds target date funds pursue the same investment objectives as the Schwab Target Date funds, invest primarily in equity (stock) and fixed income (bond) securities as do the Schwab Target Date funds, invest in both U.S. and foreign securities as do the Schwab Target Date funds, utilize a "through" glide path as do the Schwab Target Date funds, are managed by well-known investment advisers, and are available to all large retirement plans including the Plan.[14]

116.    The Schwab TDFs can thus be compared to the Callan GlidePath®, T.Rowe Price, American Funds, and MFS Lifetime target date funds ("Comparator Funds") as benchmarks.

117.    Morningstar places the four Comparator Funds and the Schwab TDFs in the Lifetime Moderate Index category because the underlying holdings of each fund match the risk return profile of this category. As is demonstrated by the Morningstar graphs at Appendix "A," and the Callan GlidePath 2040 Fund fact sheet at Appendix "B", all five funds concentrate their holdings in the large blend risk/return category. It's for this reason that the four Comparator Funds are accurate

---

express.com/summary.asp?doctype=pros&cid=capgroup&fid=02631C403        (last      visited September 11, 2025).

[14] *See* MFS Lifetime Funds Brochure, *available at* https://www.mfs.com/content/dam/mfs-enterprise/mfscom/sales-tools/sales-brochures/mfsp_lfefund_bro_DOD.pdf        (last      visited September 11, 2025).

comparators.

118.    Additionally, each of the Comparator Funds is actively managed while the Schwab TDFs is a blend of passive and active management. *See* https://www.schwabtrustbankcollectives.com/products/target-date-trusts/managed-retirement-trusts#:~:text=SMRTs%20are%20comprehensive%20investment%20portfolios,at%20the%20target%20retirement%20date. (last accessed on September 11, 2025) (Schwab TDFs "employ both active and passive strategies.").

119.    All target date funds, however, in a true sense are actively managed because the glide path of the funds must be managed by an investment manager. Regardless, for purposes of comparing the Schwab TDFs and the Comparator Funds, it matters little whether the funds are actively or passively managed because their underlying asset allocations are similar (*e.g.,* equity v. fixed income) and all the target date funds have the same investment objective.

120.    That is, depending on the proximity to its target date, defined as the year that corresponds roughly to the year in which the retiree expects to retire, the fund will seek to achieve the following objectives to varying degrees: growth, income and conservation of capital. The fund will increasingly emphasize income and conservation of capital by investing a greater portion of its assets in fixed income, equity-income and balanced funds as it continues past its target date. In this

way, the fund seeks to balance total return and stability over time.

121.    A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks (as discussed below), to evaluate the performance of the Schwab TDFs as early as the inception of the Class Period, or sooner, and on an ongoing basis thereafter.

**3.    The Schwab TDFs Chronically Underperformed Based under Morningstar and Should Have Been Never Selected in the First Place**

122.    From the start of the Class Period through at least 2024, the Plan maintained the Schwab TDFs in the V (until 2020) and VI share classes. In 2018, the Plan held over $268 million in the Schwab TDFs. *See* Auditors' Report attached to 2018 Form 5500, at 15. By the end of 2024, the Plan held over $634 million in the Schwab TDFs. *See* Auditors' Report attached to 2024 Form 5500, at 15. With such a large amount invested in the Schwab Target Date Series, the Plan would have been able to choose virtually any available target date funds for the Plan by the start of the Class Period.

123.    The Schwab TDFs were the only target date investing options in the Plan up to 2024. In other words, and throughout the Class Period, participants in the Plan who wanted to invest in a target date strategy had no choice other than the Schwab TDFs.

124.    Defendants were under an obligation under ERISA to carefully vet the

38

Schwab TDFs before selecting them for inclusion in the Plan. Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the Schwab TDFs on an ongoing basis thereafter.

125. The performance of the Schwab TDFs lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

126. The three and five year averages as early as 2014, prior to the Class Period, shows that the JPMorgan TDFs have been historically an imprudent selection. It is clear that out of more than 200 Morningstar peer funds in the Lifetime Mod target date group, the Schwab series was mediocre at best from 2014. Here, four target date series from this Morningstar peer group, the Comparator Funds identified above, will be analyzed. As of the start of the Class Period, the three and five year average returns for the Comparator Funds were consistently superior to the Schwab TDFs used by the Plan. The chart below analyzes these funds against the Schwab TDFs as of December 31, 2014.

| Investment and Benchmark | 3 Year Return 1/1/2016 -12/31/2018 | 5 Year Return 1/1/2014 -12/31/2018 |
|---|---|---|
| Schwab Managed Retirement Tr Fd 2025 V | 5.35 | 4.41 |
| Schwab Managed Retirement Tr Fd 2025 VI | 4.83 | 3.93 |
| American Funds 2025 Trgt Date Retire R6 | 6.12 | 5.00 |
| MFS Lifetime 2025 R6 | 5.46 | 4.02 |

39

| | | |
|---|---|---|
| Callan GlidePath® 2025 Fund Cl Z | 6.84 | 5.41 |
| T. Rowe Price Retirement 2025 Tr-A | 6.18 | 4.85 |
| Benchmark: Morningstar Lifetime Mod 2025 TR USD | 5.69 | 4.16 |
| | | |
| **Schwab Managed Retirement Tr Fd 2030 V** | **5.70** | **4.63** |
| **Schwab Managed Retirement Tr Fd 2030 VI** | **5.18** | **4.15** |
| American Funds 2030 Trgt Date Retire R6 | 6.92 | 5.63 |
| MFS Lifetime 2030 R6 | 6.50 | 4.59 |
| Callan GlidePath® 2030 Fund Cl Z | 7.07 | 5.40 |
| T. Rowe Price Retirement 2030 Tr-A | 6.55 | 5.16 |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 6.26 | 4.44 |
| | | |
| **Schwab Managed Retirement Tr Fd 2035 V** | **5.97** | **4.76** |
| **Schwab Managed Retirement Tr Fd 2035 VI** | **5.44** | **4.29** |
| American Funds 2035 Trgt Date Retire R6 | 7.43 | 5.95 |
| MFS Lifetime 2035 R6 | 6.72 | 4.77 |
| Callan GlidePath® 2035 Fund Cl Z | 7.18 | 5.36 |
| T. Rowe Price Retirement 2035 Tr-A | 6.77 | 5.33 |
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 6.72 | 4.61 |
| | | |
| **Schwab Managed Retirement Tr Fd 2040 V** | **6.18** | **4.91** |
| **Schwab Managed Retirement Tr Fd 2040 VI** | **5.65** | **4.43** |
| American Funds 2040 Trgt Date Retire R6 | 7.62 | 6.05 |
| MFS Lifetime 2040 R6 | 6.88 | 4.91 |
| Callan GlidePath® 2040 Fund Cl Z | 7.28 | 5.26 |

| | | |
|---|---|---|
| T. Rowe Price Retirement 2040 Tr-A | 6.98 | 5.48 |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 6.98 | 4.65 |
| | | |
| **Schwab Managed Retirement Tr Fd 2045 V** | **6.31** | **4.95** |
| **Schwab Managed Retirement Tr Fd 2045 VI** | **5.80** | **4.48** |
| American Funds 2045 Trgt Date Retire R6 | 7.77 | 6.17 |
| MFS Lifetime 2045 R6 | 6.89 | 4.91 |
| Callan GlidePath® 2045 Fund Cl Z | 7.22 | 5.22 |
| T. Rowe Price Retirement 2045 Tr-A | 7.04 | 5.53 |
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 7.05 | 4.60 |
| | | |
| **Schwab Managed Retirement Tr Fd 2050 V** | **6.35** | **5.01** |
| **Schwab Managed Retirement Tr Fd 2050 VI** | **6.17** | **4.84** |
| American Funds 2050 Trgt Date Retire R6 | 7.83 | 6.19 |
| MFS Lifetime 2050 R6 | 6.87 | 4.91 |
| Callan GlidePath® 2050 Fund Cl Z | 7.23 | 5.23 |
| T. Rowe Price Retirement 2050 Tr-A | 7.00 | 5.49 |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 7.05 | 4.51 |
| | | |
| **Schwab Managed Retirement Tr Fd 2055 V** | **6.48** | **5.06** |
| **Schwab Managed Retirement Tr Fd 2055 VI** | **6.15** | **4.76** |
| American Funds 2055 Trgt Date Retire R6 | 7.81 | 6.17 |
| MFS Lifetime 2055 R6 | 6.86 | 4.90 |
| Callan GlidePath® 2055 Fund Cl Z | 7.20 | 5.21 |
| T. Rowe Price Retirement 2055 Tr-A | 7.01 | 5.51 |

| | | |
|---|---|---|
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 7.04 | 4.42 |
| | | |
| **Schwab Managed Retirement Tr Fd 2060 V** | **6.80** | **N/A** |
| **Schwab Managed Retirement Tr Fd 2060 VI** | **6.76** | **N/A** |
| American Funds 2060 Trgt Date Retire R6 | 7.81 | |
| MFS Lifetime 2060 R6 | N/A | |
| Callan GlidePath® 2060 Fund Cl Z | 7.25 | |
| T. Rowe Price Retirement 2060 Tr-A | 7.00 | |
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 7.02 | |

127.    By 2018, the start of the Class Period, the Schwab Class V TDFs underperformed the Comparator Funds on average by 12.5% on a three-year basis and 10.1% on a five-year basis. The Schwab Class VI TDFs underperformed the Comparator Funds on average by 18.4% on a three-year basis and 18.09% on a five-year basis.

128.    Further, by the start of the Class Period in 2018, the Schwab Class V TDFs underperformed the Morningstar benchmark on average by 8.63% on a three-year basis. The Schwab Class VI TDFs underperformed the Morningstar benchmark on average by 14.63% on a three-year basis. The chart above demonstrates that the Schwab Class V TDFs should never have been selected as an investment option for Plan participants at the start of the Class Period in 2018, and that the Schwab Class VI TDFs were not a prudent alternative to the Class V TDFs in 2020.

42

129.    Clearly, analyzing data that would have been available to the Plan at the start of the Class Period, the Schwab TDFs were an imprudent selection. As of 2014, there were known superior performing alternatives which should have been selected. These alternatives are in the same style as the Schwab TDFs, namely in the Morningstar LifeTime Moderate category. These four funds are just a few out of possibly a hundred or more funds in this category which would have been superior to the Schwab TDFs.

130.    This trend continued into 2022 as demonstrated in the chart below.

| Investment and Benchmark | 3 Year Return 1/1/2020 –12/31/2022 | 5 Year Return 1/1/2018 – 12/31/2022 |
|---|---|---|
| Schwab Managed Retirement Tr Fd 2025 V | 1.57 | 3.48 |
| Schwab Managed Retirement Tr Fd 2025 VI | 1.61 | 3.43 |
| American Funds 2025 Trgt Date Retire R6 | 3.40 | 4.69 |
| MFS Lifetime 2025 R6 | 1.87 | 3.70 |
| Callan GlidePath® 2025 Fund Cl Z | 4.73 | 5.83 |
| T. Rowe Price Retirement 2025 Tr-A | 2.73 | 4.41 |
| Benchmark: Morningstar Lifetime Mod 2025 TR USD | 1.04 | 3.20 |
| | | |
| Schwab Managed Retirement Tr Fd 2030 V | 2.04 | 3.90 |
| Schwab Managed Retirement Tr Fd 2030 VI | 2.08 | 3.84 |
| American Funds 2030 Trgt Date Retire R6 | 3.67 | 5.09 |
| MFS Lifetime 2030 R6 | 2.99 | 4.73 |
| Callan GlidePath® 2030 Fund Cl Z | 5.03 | 6.08 |

| | | |
|---|---|---|
| T. Rowe Price Retirement 2030 Tr-A | 3.08 | 4.75 |
| Benchmark: Morningstar Lifetime Mod 2030 TR USD | 1.38 | 3.54 |
| | | |
| **Schwab Managed Retirement Tr Fd 2035 V** | **2.36** | **4.17** |
| **Schwab Managed Retirement Tr Fd 2035 VI** | **2.40** | **4.12** |
| American Funds 2035 Trgt Date Retire R6 | 4.39 | 5.88 |
| MFS Lifetime 2035 R6 | 4.22 | 5.71 |
| Callan GlidePath®  2035 Fund Cl Z | 5.25 | 6.27 |
| T. Rowe Price Retirement 2035 Tr-A | 3.50 | 5.11 |
| Benchmark: Morningstar Lifetime Mod 2035 TR USD | 1.95 | 3.97 |
| | | |
| **Schwab Managed Retirement Tr Fd 2040 V** | **2.62** | **4.37** |
| **Schwab Managed Retirement Tr Fd 2040 VI** | **2.66** | **4.32** |
| American Funds 2040 Trgt Date Retire R6 | 4.59 | 6.10 |
| MFS Lifetime 2040 R6 | 4.61 | 6.00 |
| Callan GlidePath®  2040 Fund Cl Z | 5.50 | 6.44 |
| T. Rowe Price Retirement 2040 Tr-A | 3.88 | 5.42 |
| Benchmark: Morningstar Lifetime Mod 2040 TR USD | 2.54 | 4.36 |
| | | |
| **Schwab Managed Retirement Tr Fd 2045 V** | **2.83** | **4.52** |
| **Schwab Managed Retirement Tr Fd 2045 VI** | **2.87** | **4.48** |
| American Funds 2045 Trgt Date Retire R6 | 4.55 | 6.11 |
| MFS Lifetime 2045 R6 | 4.95 | 6.24 |
| Callan GlidePath®  2045 Fund Cl Z | 5.45 | 6.42 |
| T. Rowe Price Retirement 2045 Tr-A | 4.21 | 5.68 |

44

| | | |
|---|---|---|
| Benchmark: Morningstar Lifetime Mod 2045 TR USD | 2.92 | 4.58 |
| | | |
| **Schwab Managed Retirement Tr Fd 2050 V** | **2.96** | **4.62** |
| **Schwab Managed Retirement Tr Fd 2050 VI** | **3.00** | **4.62** |
| American Funds 2050 Trgt Date Retire R6 | 4.34 | 6.04 |
| MFS Lifetime 2050 R6 | 4.94 | 6.24 |
| Callan GlidePath® 2050 Fund Cl Z | 5.40 | 6.39 |
| T. Rowe Price Retirement 2050 Tr-A | 4.19 | 5.66 |
| Benchmark: Morningstar Lifetime Mod 2050 TR USD | 3.04 | 4.62 |
| | | |
| **Schwab Managed Retirement Tr Fd 2055 V** | **2.97** | **4.65** |
| **Schwab Managed Retirement Tr Fd 2055 VI** | **3.02** | **4.63** |
| American Funds 2055 Trgt Date Retire R6 | 4.07 | 5.87 |
| MFS Lifetime 2055 R6 | 4.97 | 6.25 |
| Callan GlidePath® 2055 Fund Cl Z | 5.44 | 6.41 |
| T. Rowe Price Retirement 2055 Tr-A | 4.16 | 5.63 |
| Benchmark: Morningstar Lifetime Mod 2055 TR USD | 3.00 | 4.55 |
| | | |
| **Schwab Managed Retirement Tr Fd 2060 V** | **3.15** | **4.76** |
| **Schwab Managed Retirement Tr Fd 2060 VI** | **3.19** | **4.77** |
| American Funds 2060 Trgt Date Retire R6 | 3.99 | 5.82 |
| MFS Lifetime 2060 R6 | 4.97 | 6.23 |
| Callan GlidePath® 2060 Fund Cl Z | 5.47 | 6.44 |
| T. Rowe Price Retirement 2060 Tr-A | 4.15 | 5.63 |
| Benchmark: Morningstar Lifetime Mod 2060 TR USD | 2.92 | 4.46 |

45

131.    By the end of 2022, the Schwab Class V TDFs underperformed the Comparator Funds on average by 38.58% on a three-year basis and 24.80% on a five-year basis. The Schwab Class VI TDFs underperformed the Comparator Funds on average by 38.80% on a three-year basis and 25.47% on a five-year basis.

132.    Again, there's no reason why the Plan's fiduciaries should have chosen the Schwab TDFs over the many superior performing alternatives. Had the fiduciaries to the Plan been putting the interests of Plan participants first, the Schwab TDFs would not have been selected for the Plan.

133.    To make matters worse, the Schwab TDFs had some of the worst fund rankings in 2018 and 2022 in its Morningstar Category, which tracks the funds appropriate index, Lifetime Moderate TR USD. This data was available to the Plan fiduciaries before and during the Class Period in real time and does not constitute any sort of hindsight analysis.

| Investment | Percentile Rank 3-Year Return Ending 2018 | Percentile Rank 3-Year Return Ending 2020 | Percentile Rank 5-year Return ending 2018 | Percentile Rank 5-year Return ending 2020 |
|---|---|---|---|---|
| Schwab Managed Retirement Tr Fd 2025 V | 33rd | 21st | 43rd | 55th |
| Schwab Managed Retirement Tr Fd 2025 VI | 73rd | 27th | 73rd | 59th |
| Schwab Managed Retirement Tr Fd 2030 V | 51st | 23rd | 40th | 65th |
| Schwab Managed Retirement Tr Fd 2030 VI | 85th | 29th | 74th | 67th |

| | | | | |
|---|---|---|---|---|
| Schwab Managed Retirement Tr Fd 2035 V | 53rd | 27th | 50th | 71st |
| Schwab Managed Retirement Tr Fd 2035 VI | 79th | 31st | 82nd | 76th |
| Schwab Managed Retirement Tr Fd 2040 V | 65th | 30th | 40th | 83rd |
| Schwab Managed Retirement Tr Fd 2040 VI | 87th | 36th | 79th | 89th |
| Schwab Managed Retirement Tr Fd 2045 V | 54th | 37th | 47th | 85th |
| Schwab Managed Retirement Tr Fd 2045 VI | 86th | 43rd | 82nd | 85th |
| Schwab Managed Retirement Tr Fd 2050 V | 58th | 40th | 34th | 89th |
| Schwab Managed Retirement Tr Fd 2050 VI | 67th | 41st | 50th | 89th |
| Schwab Managed Retirement Tr Fd 2055 V | 51st | 43rd | 43rd | 89th |
| Schwab Managed Retirement Tr Fd 2055 VI | 72nd | 46th | 73rd | 89th |
| Schwab Managed Retirement Tr Fd 2060 V | 35th | 41st | | 83rd |
| Schwab Managed Retirement Tr Fd 2060 VI | 36th | 43rd | | 79th |

134. Given the long history of underperformance of the Schwab TDFs, it is clear that these funds were an imprudent choice and should have been replaced at the start of the Class Period.

135. Failure to remove the funds caused real and material harm to the Plaintiffs and putative class. Even small differences in returns between the Schwab Managed Retirement Series and other funds result in significant loss to the Plan.

136. There's no justifiable excuse for having allowed the Schwab TDFs to

47

be selected as investment options for Plan participants or to languish in the Plan until the end of 2024 without taking any action at all. This issue has nothing to do with any differences in the purpose of the Series or any possible justifiable difference in investment strategy, it's simply evidence of a clearly flawed investment strategy.

137.    By choosing or continuing to include the Schwab TDFs in the Plan despite the clear evidence that the funds had a flawed investment strategy as evidenced by the Series' performance for many years prior to the Class Period and during the Class period, it deprived Plan participants of meaningful returns costing them millions of dollars in retirement savings needlessly. The Schwab TDFs should never have been selected for the Plan and certainly should not have been permitted to languish in the Plan for years with no action taken by the Plan fiduciaries.

**C.    Defendants Committed a Prohibited Transaction Resulting in Excessive RKA costs for the Plan and its Participants**

138.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

**1.    ERISA's Fee Disclosure Rule**

139.    In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly

48

known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[15]

140.  The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such a contract or arrangement.

141.  For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

---

[15] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf    ("DOL    408(b)(2) Regulation Fact Sheet").

142. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

143. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

144. Instead, plan administrators have a separate obligation under 29 CFR § 2550, 404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

2. Prohibited Transactions

145. During the Class Period, Defendants entered into a contract with Schwab to provide RKA services to the Plan. However, such an engagement is a prohibited transaction under ERISA.

146. 29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

147. Here, Schwab was a party in interest to the Plan as it was receiving

50

compensation for RKA services, as well as compensation from trustee services from the Plan and additional income from certain of the Plan's investment securities, like the Schwab TDFs.

### 3.    Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

148.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

149.    There are two essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

    A.    Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

    B.    Multi-channel participant and plan sponsor access (e.g. phone, web);

    C.    Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

    D.    Payroll service (e.g. hardships, in-service withdrawals,

termination distributions);

E.    Participant tax reporting services (e.g., IRS Form 1099-R);

F.    Participant confirmations, statements, and standard notices;

G.    Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.    Participant education (e.g. newsletters, web articles, standard communication materials);

I.    Plan consulting (e.g., preapproved document services, operational materials);

J.    Plan consulting (e.g. preapproved document services, operational compliance support).

150. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

151. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account

balance. These A La Carte services typically include, but are not limited to, the following:

    a.    Loan processing;

    b.    Brokerage services/account maintenance (if offered by the plan);

    c.    Distribution services; and

    d.    Processing of qualified domestic relations orders.

152. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

153. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study, at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As

53

a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis***.

154.  In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant***.

155.  Recordkeepers for large 401(k) plans such as Schwab, Fidelity, Vanguard, Empower, Alight, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (e.g., website, call center, and some print services).

156.  Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

157.  The incremental costs caused by additional participants may include: mailing costs, if materials are delivered by mail versus Internet; telephone inquiries

54

through an 800 number; check distributions from the 401(k) plan to the participant; and/or any in person or off line participant education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

158.    Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

4.    **Much of the Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Plan Fiduciaries**

159.    A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

160.    More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods*

*Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

161.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[16]

162.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

163.    Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe at minimum the fiduciary topics discussed and the rationale for resulting decisions. Any related documents or data considered for purposes of the fiduciary review (*e.g.*, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Plaintiffs asked pre-suit for meeting minutes which the Plan administrator did not provide.

---

[16] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

56

164. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

165. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and recordkeeping fees which wasted the assets of the Plan and the assets of participants.

> **5. Circumstantial Facts and Evidence Plausibly Show that the Plan Paid Unreasonable Recordkeeping Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**

> **a. The Plan's Recordkeepers Offered Routine Services**

166. The RKA services performed each year by Schwab Retirement Plan Services for the Plan during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 15, 26, 50, and 64. Below is a description of the recordkeeping codes:

15 – Recordkeeping and information management (computing, tabulating, data processing etc.)

26 – Investment Advisory (participants)

50 – Direct payment from the plan

64 – Recordkeeping fees

*See* Instructions for the 2022 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2022-instructions.pdf at 25-29.

167.  Again, the above services are not out of the ordinary from the services other national recordkeepers provide. Any fees associated with other ancillary a la carte services performed by the Recordkeepers would be negligible because they are on a participant-by-participant basis instead of plan-wide.

> **b.    There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period**

168.  As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct an RFP.

169.  Here, based on the fact that the Plan paid relatively the same amount in recordkeeping fees from 2016 to 2020, there is little to suggest that Defendants conducted a RFP, or at least an effective one, at reasonable intervals to determine

whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. Below are some of the top recordkeeping providers in the country that RFPs could have been sent to:

### 2020 TOP PROVIDERS (RECORDKEEPERS)[17]

### Top 10, by Total 401(k) Assets ($MM)

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

170. These recordkeepers are capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

---

[17] See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/

59

> c.   **The Plan's Recordkeeper Fees were Excessive were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

171.   Because recordkeeping costs are not principally affected by individual account asset size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

172.   As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

173.   The Plan's per participant RKA fees were as follows:

| Novo Nordisk Plan | | | |
|---|---|---|---|
| **Plan Year** | **Participants** | **Total Direct Costs** | **Per Participant Charge $PP** |
| 2018 | 7,813 | $84,119 | $10.77 |
| 2019 | 7,760 | $401,945 | $51.80 |
| 2020 | 8,568 | $440,310 | $51.39 |
| 2021 | 8,060 | $559,845 | $69.46 |
| 2022 | 9,147 | $592,207 | $64.74 |
| 2023 | 10,201 | $686,460 | $67.29 |
| 2024 | 11,252 | $774,372 | $68.82 |

174.   Except for Plan year 2018, the above fees were astronomical when benchmarked against similar plans. Indeed, the fact that RKA fees jumped five-fold

60

from 2018 to 2019 when the number of Plan participants remained static, is a clear indication of imprudent conduct on the part of the Plan's fiduciaries.

175. From 2019 through 2024, the Plan had a low of approximately 7,760 total participants in 2019 to a high of 11,252 total participants in 2024 making it eligible for some of the lowest fees on the market.

176. As discussed above, the recordkeeping was performed throughout the Class Period by Schwab Retirement Plan Services.

177. The leading publication that collects 401(k) data, BrightScope/ICI, categorizes plans in the following tranches:

EXHIBIT I.2

**Universe of 401(k) Plans**

Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2018

| | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| **Plan assets** | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Less than $1M | 343,108 | 58.5% | 6,007.5 | 8.4% | $107.1 | 2.1% |
| $1M to $10M | 208,789 | 35.6 | 13,660.6 | 19.1 | 620.7 | 12.2 |
| >$10M to $50M | 26,458 | 4.5 | 9,894.5 | 13.9 | 532.4 | 10.4 |
| >$50M to $100M | 3,564 | 0.6 | 4,808.0 | 6.7 | 247.1 | 4.8 |
| >$100M to $250M | 2,407 | 0.4 | 6,744.8 | 9.5 | 374.7 | 7.3 |
| >$250M to $500M | 1,034 | 0.2 | 5,395.1 | 7.6 | 362.1 | 7.1 |
| >$500M to $1B | 603 | 0.1 | 4,763.9 | 6.7 | 424.1 | 8.3 |
| More than $1B | 659 | 0.1 | 20,073.4 | 28.1 | 2,439.7 | 47.8 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

| | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| **Number of plan participants** | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Fewer than 100 | 522,277 | 89.0% | 10,960.2 | 15.4% | $709.2 | 13.9% |
| 100 to 499 | 50,477 | 8.6 | 9,841.2 | 13.8 | 549.9 | 10.8 |
| 500 to 999 | 6,375 | 1.1 | 4,424.5 | 6.2 | 266.1 | 5.2 |
| 1,000 to 4,999 | 5,807 | 1.0 | 12,136.0 | 17.0 | 886.3 | 17.4 |
| 5,000 to 9,999 | 842 | 0.1 | 5,828.1 | 8.2 | 506.0 | 9.9 |
| 10,000 or more | 844 | 0.1 | 28,157.8 | 39.5 | 2,190.4 | 42.9 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.

Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

178.    Based on the above chart, the billion-dollar asset mark is significant as all plans over a billion dollars are considered a category of their own.

179.    Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan from 2019 through 2024 shows that the Plan was paying higher recordkeeping fees than its peers.[18]

| Record-keeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | $843,224,007 | 10,072 | 37 60 64 65 71 | Yes - $0 | $22 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2019 | $939,399,569 | 18,674 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $25 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | $435,391,716 | 14,698 | 37 60 64 65 71 | Yes - $0 | $23 |
| **Schwab** | **Novo Nordisk Plan** | **2019** | **$1,489,151,588** | **7,760** | **15 50 64** | **No** | **$52** |
| | | | | | | | |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| **Schwab** | **Novo Nordisk Plan** | **2020** | **$1,742,604,918** | **8,568** | **15 26 50 64** | **No** | **$51** |
| | | | | | | | |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |

---

[18] Unless otherwise noted, these fees are taken from the Form 5500.

| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| **Schwab** | **Novo Nordisk Plan** | **2021** | **$1,995,021,356** | **8,060** | **15 26 50 64** | **No** | **$69** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37 60 64 65 71 | Yes - $0 | $30 |
| **Schwab** | **Novo Nordisk Plan** | **2022** | **$1,769,202,694** | **9,147** | **15 26 50 64** | **No** | **$65** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | **$1,915,519,824** | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| **Schwab** | **Novo Nordisk Plan** | **2023** | **$2,303,296,181** | **10,201** | **15 26 50 64** | **No** | **$67** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2024 | $2,141,432,097 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $40 |
| Fidelity | Fortive Retirement Savings Plan | 2024 | **$2,138,117,923** | 13189 | 37, 64, 65, 71 | Yes - $0 | $29 |
| **Schwab** | **Novo Nordisk Plan** | **2024** | **$2,538,744,944** | **11,252** | **15 26 50 64** | **No** | **$69** |

180.   The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees over the course of the Class Period.

64

181.    As of the end of 2020 there were only 892 (0.1%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plan's $62 per participant average fee from 2019 to 2024 is 138% greater than the average fee of $26 per participant from 2019 to 2024 for the sixteen (16) plans listed above.

182.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through at least 2024. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2024.

183.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $26 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

184.    Further, because Schwab Retirement Plan Services received income from the funds it maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration in considering whether RKA fees paid to Schwab were reasonable.  When considered together, the fees being paid to Schwab were clearly unreasonable.

185.    The $26 range is not an exact rate that every Plan participant should have paid. To the extent Defendants collected recordkeeping fees through an asset-

65

based percentage fee, the amount participants paid for recordkeeping fees was a function of a percentage level and the assets in each participant's account. Meaning, the actual amounts paid by Plan participants varied according to the assets in their accounts.

186.   A lower dollar amount paid in fees is primarily reflective of a low balance in the participant's account. Therefore, if the average per participant fee was reduced to the $26 range, the pro rata rates for all participants, including those that were paying less than the $26 range, would drop proportionally according to the level of assets in their accounts.

187.   Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

## COUNT I
### Breach of Fiduciary Duty of Prudence
### (Asserted against the Committee)

188.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

189.   At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of

66

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

190. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

191. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint, including mismanagement of investment funds and failing to control the costs of the Plan's recordkeeping and administrative costs.

192. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

67

193.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

194.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendants' own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Novo Nordisk and the Board Defendants)**

195.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

196.    Novo Nordisk and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

68

197.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

198.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendants.

199.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions, including with respect to allowing the Company to use forfeited funds to pay for Plan RKA services; and

(b)    failing to remove Committee members whose performance was inadequate in that they continued to maintain excessive RKA costs,

69

all to the detriment of the Plan and Plan's participants' retirement savings.

200.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

201.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## COUNT III
### Prohibited Transactions
### (Asserted against All Defendants)

202.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

203.   ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a

party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

204.  ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

205.  ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

206.  Defendants' decision to agree to pay excessive fees to Schwab as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

207.  Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## **PRAYER FOR RELIEF**

71

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the

Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: September 18, 2025              **CAPOZZI ADLER, P.C.**

73

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
New Jersey Bar No. 025622001
James A. Maro, Esquire
New Jersey Bar No. 017052000
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
            jamesm@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*

74

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: _Mark K. Gyandoh_
Mark K. Gyandoh, Esquire.