NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHN FUMICH, *et al.*, *individually and on behalf of all others similarly situated*, | |
| Plaintiffs, | Civil Action No. 24-9158 (ZNQ) (JBD) |
| v. | OPINION |
| NOVO NORDISK INC., *et al.*, | |
| Defendants. | |

QURAISHI, District Judge

THIS MATTER comes before the Court upon a consolidated Motion to Dismiss and Motion to Strike filed on November 21, 2025, by Defendants Novo Nordisk Inc. ("Novo Nordisk"), the Board of Directors of Novo Nordisk Inc. (the "Board"), and the Novo Nordisk Inc. Retirement Committee (the "Retirement Committee") (collectively, "Defendants"). ("Motion," ECF No. 42.) Defendants filed a Memorandum of Law in support of the Motion. ("Moving Br.," ECF No. 42-1.) Plaintiffs John Fumich, Laura Mischley, Raphael Hinton, Ronnie McLean, and Thomas Chaffin, individually and on behalf of a proposed class (collectively "Plaintiffs") filed a Brief in Opposition on December 22, 2025. ("Opp'n Br." ECF No. 45.) Defendants filed a Reply Brief in Support of their Motion on January 9, 2026. ("Reply," ECF No. 46.) Thereafter, Plaintiffs and Defendants filed letters containing supplemental authorities in support of their respective arguments. (ECF Nos. 47, 48.)

1

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[1] For the reasons set forth below, the Court will **GRANT** Defendants' Motion.

## I.      BACKGROUND AND PROCEDURAL HISTORY

### A.      BACKGROUND

The crux of this lawsuit centers on Defendants alleged mismanagement of Novo Nordisk's 401(k) Savings Plan (the "Plan"). ("Am. Compl.," ECF No. 38.) Novo Nordisk "engages in the research and development, manufacture, and distribution of pharmaceutical products" throughout the world. (*Id.* ¶ 36.) As a benefit to its employees, Novo Nordisk offers its employees the ability to participate in and contribute to the Plan. (*Id.* ¶ 56.) The Plan is a "defined contribution" or "individual account" plan, within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), and is intended to provide employees with retirement benefits. (*Id.*) Eligible employees can elect to make three different types of contributions to the Plan: (1) Employee Pre-Tax Contributions; (2) Roth 401(k) Contributions; and (3) After-Tax Contributions. (*Id.* ¶ 60.) Retirement benefits provided by the Plan are based solely on the amounts allocated to each participant's account. (*Id.* ¶ 56.) For the different types of contributions made to the Plan, separate accounts are set up on the participant's behalf, including an employee pre-tax deferral account, matching contribution account, basic employer contribution account, after-tax contribution account, Roth 401(k) contribution account, Roth in-Plan account, and a rollover account. (*Id.* ¶ 69.)

Novo Nordisk, either directly or through its Board, appointed the Retirement Committee to ensure that the investments available to the Plan's participants were appropriate and performed well compared to their peers. (*Id.* ¶¶ 37, 40.) The Retirement Committee's role is to "administer

---

[1] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure unless otherwise noted.

the Plan in accordance with its terms and the Charter of the Retirement Committee of the Company and shall have all the powers necessary to carry out the provisions of the Plan." (*Id.* ¶ 43.) The Retirement Committee also has the "exclusive authority and discretion to direct the Trustee to establish one or more investment funds for the investment of the assets of the Trust Fund." (*Id.* ¶ 44.) As an administrator of the Plan, the Retirement Committee was required to "use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." (*Id.* ¶ 45.)

According to Plaintiffs, the Plan's assets included Schwab Managed Retirement Target Date Funds ("Schwab TDFs"). (*Id.* ¶ 22.) The Schwab TDFs are pooled investment vehicles available only to qualified retirement plans and are similar in structure to mutual funds. (*Id.* ¶ 24.) Moreover, target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date. (*Id.* ¶ 91.) The target date refers to the participant's expected retirement year (e.g., "target date 2030" funds are for individuals who intend to retire in 2030). (*Id.* ¶ 98.)

Although no two target date series are identical, the general strategy, underlying investments, and risk profile are the same. (*Id.* ¶ 93.) Target date funds include many types of assets, including equity (stock) and fixed income (bond) securities. (*Id.* ¶ 95.) Target date funds automatically rebalance their portfolios to become more conservative as the participant nears retirement. (*Id.* ¶ 96.) This rebalancing occurs based on the fund's "glide path," which determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches. (*Id.* ¶ 97.)

Target date funds are divided into two broad categories by industry professionals based on the fund's glide path: "to" and "through" target date funds. (*Id.* ¶ 99.) A "to" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. (*Id.*) In contrast, a "through" target date fund continues its glide path progression to reach its most conservative asset allocation past the expected retirement date, focusing on the life expectancy of the participant rather than the retirement year. (*Id.*) The Schwab TDFs in the Plan are "through" funds. (*Id.* ¶ 100.)

According to Plaintiffs, who were participants in the Plan, Defendants failed to administer the Plan in a prudent manner. (*Id.* ¶ 88.) Specifically, Plaintiffs allege that the Schwab TDFs underperformed compared to various comparator funds, and that if Defendants had acted prudently, they would have had no reason to choose the Schwab TDFs for the Plan. (*Id.* ¶¶ 191–92.) In support of these allegations, Plaintiffs point to the Morningstar Lifetime Moderate Index Category, which they contend is the "most well respected and accepted financial industry fund database." (*Id.* ¶ 105.) A Morning Star Category is assigned by placing funds into peer groups based on their underlying holdings. (*Id.* ¶ 106.) The categories were created to "help investors make meaningful comparisons between mutual funds." (*Id.* ¶ 107.)

Plaintiffs further allege that by 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations. (*Id.* ¶ 109.) These other investment managers include Callan Glidepath, American Funds, T. Rowe Price and Mutual of America. (*Id.* ¶ 110.) Plaintiffs refer to the T. Rowe Price Retirement Target Date A Series, the American Funds Target Date R6 Series, the Callan GlidePath Target Date Cl Z Series, and the MFS Lifetime R6 Series as the "Comparator Funds." (*Id.* ¶ 112.) Plaintiffs further allege that the

Comparator Funds are grouped in the same Morningstar Category as the Schwab TDFs and are comparable in several respects: (1) each fund is a large blend style fund; (2) each fund is actively managed; (3) each fund utilizes "through" glide paths; and (4) the funds pursue the same investment objectives. (*Id.* ¶¶ 113–15.)

At the start of the Class Period, the Plan maintained the Schwab TDFs in the V (until 2020) and VI share classes. (*Id.* ¶ 122.) According to Plaintiffs, the Schwab TDFs were the only target date investing options in the Plan up to 2024, which meant that participants in the Plan who wanted to invest in a target date strategy had no choice other than the Schwab TDFs. (*Id.* ¶ 123.) Plaintiffs allege that the Schwab TDFs underperformed compared to the Comparator Funds for many years prior to the Class Period, which they contend proves that it was an imprudent choice for the Plan. (*Id.* ¶¶ 126–28.) Plaintiffs maintain that this trend continued throughout the Class Period. (*Id.* ¶¶ 129–31.) Given the Schwab TDFs' alleged underperformance, Plaintiffs assert that there was no reason for Defendants to choose them over the many other superior performing funds. (*Id.* ¶ 132.) As a result, Plaintiffs allege that Defendants acted in an imprudent manner and cost Plan participants millions of dollars in retirement savings. (*Id.* ¶¶ 134, 137.)

Plaintiffs further allege that Defendants engaged in a prohibited transaction by contracting with Schwab to provide recordkeeping and administrative ("RKA") services. (*Id.* ¶ 145.) According to Plaintiffs, a fiduciary of an ERISA plan may not engage in a transaction if the transactions constitute a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest." (*Id.* ¶ 146.) Defendants allegedly violated this prohibition by contracting with Schwab for RKA services because Schwab "was a party in interest to the Plan" as it was receiving "compensation from trustee services from the Plan and additional income from certain of the Plan's investment securities, like the Schwab TDFs." (*Id.* ¶ 147.)

In addition to being a prohibited transaction, Plaintiffs allege that Defendants had a fiduciary duty to ensure that the fees for the RKA services were reasonable. (*Id.* ¶¶ 159, 165.) According to Plaintiffs, the Plan essentially paid the same amount of RKA fees from 2016 to 2020. (*Id.* ¶ 169.) Plaintiffs contend that this suggests Defendants did not attempt to negotiate or lower the Plan fees or submit any requests for proposals to other RKA providers. (*Id.*) Moreover, Plaintiffs claim that other RKA providers were less expensive, and that if Defendants had sought a competitive rate, the Plan would have benefited from a significant reduction in RKA fees. (*Id.* ¶¶ 170–79.)

Based on these allegations, Plaintiffs assert three causes of action in the Amended Complaint: (1) Breach of Fiduciary Duty of Prudence (Count One); (2) Failure to Adequately Monitor Other Fiduciaries (Count Two); and (3) Prohibited Transactions (Count Three). Count One is asserted against the Retirement Committee, which was the administrator of the Plan, and relates to the Retirement Committee's decision to select the Schwab TDFs and its alleged failure to minimize RKA fees. (*Id.* ¶¶ 44, 191.) Count Two is asserted against Novo Nordisk and the Board, and concerns their alleged failure to monitor the Retirement Committee and ensure that the Retirement Committee was adequately performing its fiduciary obligations. (*Id.* ¶¶ 196–97.) Count Three is asserted against all Defendants and relates to the alleged prohibited transaction with Schwab. (*Id.* ¶ 206.)

### B.    PROCEDURAL HISTORY

Plaintiffs initially filed a class action Complaint against Defendants on September 13, 2024. (ECF No. 1.) The initial Complaint asserted four causes of action for breach of the fiduciary duty of prudence (Count One); breach of the fiduciary duty of loyalty (Count Two); breach of ERISA's Anti-Inurement Provision (Count Three); and failure to monitor fiduciaries (Count Four).

Defendants subsequently filed a Motion to Dismiss (ECF No. 22), which the Court granted on August 19, 2025 (ECF No. 35). The Court dismissed Counts One through Four to the extent they were premised on the decision to include Schwab TDFs as Plan investments or to use forfeitures to offset contributions instead of paying recordkeeping fees. ("Opinion," ECF No. 34 at 18.) However, the Court permitted the portion of Count One alleging that the Retirement Committee breached its duty of prudence by allowing the Plan to pay excessive RKA fees to proceed, along with the portion of Count Four alleging that the Monitoring Defendants breached their duty to monitor the Retirement Committee regarding that issue. (*Id.*) The Court further permitted Plaintiffs to file an Amended Complaint, limited to remedying the defects identified in the Court's Opinion. (ECF No. 35.)

On September 18, 2025, Plaintiff filed an Amended Complaint. Defendants subsequently filed the instant Motion to Dismiss and Motion to Strike Plaintiff's New Claim related to the alleged prohibited transaction. Plaintiffs filed an Opposition Brief, and Defendants filed a Reply Brief in Support of their Motion. On March 19, 2026, Defendants filed a Notice of Supplemental Authority. On June 9, 2026, Plaintiff filed a Notice of Supplemental authority.

## II.    SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction over the claims in the Amended Complaint pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

## III.    LEGAL STANDARD

### A.    MOTION TO DISMISS

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and

7

the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B.     MOTION TO STRIKE**

Federal Rule of Civil Procedure 12(f) provides that the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f). While a motion to strike is generally disfavored, it may be appropriate when a defendant has ignored the requirements of Rule 15(a). *See U.F.C.W. Local 56 Health and Welfare*

*Fund v. J.D.'s Mkt.*, 240 F.R.D. 149, 154 (D.N.J. Jan. 11, 2007).  Under Rule 15(a)(2), a plaintiff must seek leave before amending its complaint.  Fed. R. Civ. P. 15(a)(2).

## IV.    DISCUSSION

### A.  BREACH OF THE FIDUCIARY DUTY OF PRUDENCE (COUNT ONE)

In Count One of the Amended Complaint, Plaintiffs reassert that the Retirement Committee, as fiduciaries of the Plan, breached the fiduciary duty of prudence by mismanaging the Plan's assets and by failing to control the costs of the Plan's RKA services.[2]  (Am. Compl. ¶¶ 191–92.)  To state a claim for a breach of a fiduciary duty under ERISA, Plaintiffs must plausibly allege that "(1) a plan fiduciary (2) breache[d] an ERISA-imposed duty (3) causing a loss to the plan."  *Barragan v. Honeywell Int'l Inc.*, Civ. No. 24-4529, 2024 WL 5165330, at *4 (D.N.J. Dec. 19, 2024) (quoting *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007), *as amended* (Dec. 21, 2007)).

One of the duties ERISA imposes is the duty of prudence.  29 U.S.C. § 1104(a).  The duty of prudence commands a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1104(a)(1)(B).  Moreover, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  *Id.* § 1104(a)(1)(A).  Fiduciaries are also required to diversify investments unless it is imprudent to do so, and to administer the plan according to the governing documents

---

[2] Because Defendants did not move to dismiss the portion of Count One related to the RKA fees, the Court does not address that claim here.

and instruments. *Id.* §§ 1104(a)(1)(C), (D). Fiduciaries are personally liable for losses due to breach. *Id.* § 1109(a).

A fiduciary must prudently select investments, and the failure to "monitor . . . investments and remove imprudent ones" may constitute a breach. *See Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019), *abrogated on other grounds by Hughes v. Northwestern Univ.*, 595 U.S. 170 (2022). When assessing a fiduciary's performance, a district court should look "at process rather than results." *Sweda*, 923 F.3d at 329. The "process must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Id.* "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings." *Id.* ("The law expects more than good intentions. A pure heart and an empty head are not enough.") (citation modified).

The focus is on the "fiduciary's conduct in arriving at an investment decision," and courts must "ask[] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment" at the time the fiduciary acted. *See In re Unisys Sav. Plan. Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (citation modified). Because "the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Hughes*, 595 U.S. at 177 (citation modified) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). At the pleading stage, a plaintiff does not need to have directly alleged how the fiduciaries mismanaged the plan, so long as there are allegations of "substantial circumstantial evidence from which the District Court could 'reasonably infer' that a breach had occurred." *Sweda*, 923 F3d at 332. While direct allegations of imprudence are not necessary, "assertions of imprudence based on allegations of investment underperformance must 'provide a sound basis for comparison—a meaningful benchmark—to show a prudent fiduciary in like circumstances would have selected a different

fund [or course of action].'" *Grink v. Virtua Health, Inc.*, 812 F. Supp. 3d 434, 452 (D.N.J. Dec. 3, 2025) (quoting *Silva v. Evonik Corp.*, Civ. No. 20-2202, 2020 WL 12574912, at *5 (D.N.J. Dec. 30, 2020)).  The benchmarks must be "specific" and "sufficiently similar to render the comparisons valid."  *Id.* (quoting *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 188 (3d Cir. 2024)); *see also Cho v. Prudential Ins. Co. of Am.*, Civ. No. 19-19886, 2021 WL 4438186, at *8 n. 7 (D.N.J. Sept. 27, 2021) ("Comparing apples and oranges is not a way to show" a meaningful benchmark such "that one [investment] is better or worse than the other.").

For the reasons set forth below, the Court finds that Plaintiffs have failed to allege facts sufficient to state a claim that the Retirement Committee acted imprudently when it selected the Schwab TDFs for the Plan.  According to Plaintiffs, the Retirement Committee acted imprudently both when it selected the Schwab TDFs in 2018 and when it continued to offer those funds throughout the Class Period.  (Am. Compl. ¶¶ 90, 127, 129, 132.)  According to Plaintiffs, the data available to Defendants as early as 2014 and continuing throughout the Class Period demonstrated: "(1) consistent and material underperformance compared to the marketplace median, (2) consistent and material underperformance against similar TDFs, (3) dismal fund rankings according to industry experts, and (4) the availability of more prudent alternatives."  (Opp'n Br. at 13.) Plaintiffs contend that this information constitutes circumstantial evidence that Defendants failed to engage in a prudent process when selecting and retaining the Schwab TDFs.  (Opp'n Br. at 13–14.)

Specifically, Plaintiffs claim that the Comparator Funds are similar to the Schwab TDFs because they have the same investment objectives, invest primarily in equity (stocks) and fixed income (bonds) securities, invest in both U.S. and foreign securities, utilize a "through" glide path, and are available to all large retirement plans.  (Am. Compl. ¶ 115.)  However, as Defendants point

out, the fact that the Schwab TDFs performed worse than the alleged Comparator Funds is irrelevant because those funds are not meaningful benchmarks.  Plaintiffs fail to explain what the investment objectives are, or explain how that would make the Comparator Funds a meaningful benchmark.  Moreover, the fact that these funds primarily invest in stocks and bonds are features "common to most, if not all, target date funds." *See Phillips v. Cobham Adv. Elec. Sols., Inc.*, Civ. No. 23-3785, 2025 WL 2689268, at *6 (N.D. Cal. Sept. 19, 2025); *see also Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1150 (N.D. Cal. 2022) (allegation that challenged target date funds and comparators were all "long-term investment vehicle[s]" that invested in a "combination of asset classes" were "generic TDF features" that could not plead a meaningful benchmark), *aff'd* 137 F.4th 1015 (9th Cir. 2025).  Simply because these funds all utilize a "through" glide path does not necessarily make them a meaningful benchmark, especially given that there are only two glide path options to choose from.  Applying Plaintiffs' logic, that would make almost every target date fund that used a "through" glide path a "meaningful benchmark," regardless of any other differences in the funds. *See Phillips*, 2025 WL 2689268, at *7 (comparator was not a meaningful benchmark for challenged target date fund even though they had similar glidepath strategies because the "asset allocation differs significantly"); *Bracalente (II) v. Cisco Sys., Inc.*, Civ. No. 22-4417, 2025 WL 770350, at *5 (N.D. Cal. Mar. 11, 2025) (holding that funds with same glide path and management firm may not be "comparable without evaluating the broader circumstances surrounding" the funds).

Most damaging to Plaintiffs' claim, however, is that the Comparator Funds and Schwab TDFs employ materially different management styles.  As alleged, the Comparator Funds are entirely "actively" managed.  (Am. Compl. ¶ 118.)  In an actively managed fund, portfolio managers exercise discretion in selecting stocks or bonds, with the goal of outperforming a

12

benchmark index. (*Id.* ¶ 101.)  In contrast, the Schwab TDFs consist of both "actively" and "passively" managed funds. (*Id.* ¶ 118.)  With passive management, there is no discretion or research needed, and the portfolio manager simply attempts to mimic the performance of a relevant benchmark index. (*Id.* ¶ 101.)  As numerous courts have recognized, actively managed funds and funds employing passive or blended strategies do not serve as meaningful benchmarks for comparison.  *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022) (holding that actively managed and passively managed funds, which have "distinct goals and distinct strategies," are inapt comparators); *Bracalente (I) v. Cisco Systems, Inc.*, Civ. No. 22-4417, 2024 WL 2274523, at *8 (N.D. Cal. May 20, 2024) (dismissing the complaint because the comparator funds were actively managed whereas the challenged funds were passively managed); *del Bosque v. Coca-Cola Southwest Beverages LLC*, Civ. No. 25-1270, 2025 WL 3171326, at *3 (N.D. Tex. Nov. 13, 2015) ("[T]he JPMorgan TDF accounts are a blend of passive and active management while its comparators are all actively managed.  Because the accounts are managed differently, the Court concludes that the alleged comparators are not meaningful benchmarks.").

Moreover, the Comparator Funds and Schwab TDFs have different asset allocations. Although Plaintiffs assert otherwise, their assertion is directly contradicted by the Appendices attached to the Amended Complaint.  The asset allocation of each fund is outlined below[3]:

| Fund | Equity | Fixed Income |
|---|---|---|
| Schwab TDF 2040 | 77.8% | 22.27% |
| T. Rowe Price 2040 | 85.1% | 9.49% |
| American Fund 2040 | 79.33% | 15.56% |
| MFS Lifetime | 92.24% | 7.11% |
| Callan 2040 | 82.8% | 5.4% |

---

[3] Each of the funds invest in cash and other assets, which is why the total percentage of equity and fixed income may not equal 100%.

As illustrated above, there are meaningful differences in fixed-income allocations between the Comparator Funds and the Schwab TDF, with differences of 6.71% for American Funds, 12.78% for T. Rowe Price, 15.16% for MFS, and 16.87% for Callan.  Only the American Fund has a similar asset allocation, while the other three reflect the funds' different risk profiles and render them unsuitable benchmarks for the Schwab TDFs.  *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 n.2 (8th Cir. 2018) (holding that funds had a different investment strategy where the comparator funds held between 14% to 18% less in bond holdings)[4]; *Phillips*, 2025 WL 2689268, at *6 (difference of 13% to 27% in stock holdings reflected "fundamentally different investment strategies and risk preferences," making the comparator funds inapt).  Accordingly, given the differences in asset allocation and management styles, the Comparator Funds are not meaningful benchmarks and their alleged outperformance relative to the Schwab TDFs does not support a reasonable inference that Defendants acted imprudently in selecting the Schwab TDFs for the Plan.[5]

Even if the Comparator Funds could be considered meaningful benchmarks, the Schwab TDFs' alleged underperformance compared to those funds does not support an inference that Defendants acted imprudently.  In the Amended Complaint, Plaintiffs provide three charts comparing the Schwab TDFs' performance against the Comparator Funds and the Morningstar Index.  The first chart compares the three- and five-year returns of the Schwab TDF Class V and VI Funds to the Comparator Funds and the Morningstar Lifetime Index in 2018.  (Am. Compl.

---

[4] The Eighth Circuit in *Meiners* does not explicitly reference the percentage of bond holdings between the various funds.  Rather, this Court reviewed the documents cited by the district court in *Meiners* to determine the differences in asset allocation that the Eighth Circuit held were sufficiently different.  *See Meiners v. Wells Fargo & Co.*, Civ. No. 16-3981, 2017 WL 2303968, at *3 (D. Minn. May 25, 2017) (citing Holland Decl. Ex. 6, at 77 and Bullard Decl. Ex. C at 3–4).

[5] Because the Court finds that the Comparator Funds are not meaningful benchmarks, Plaintiffs' remaining allegations concerning the Schwab TDFs performance compared to the Morningstar Category are insufficient for the Court to infer an imprudent process.  Indeed, Plaintiffs themselves appear to concede that a comparison to an index alone is insufficient and must be coupled with specific comparators.  (Opp'n Br. at 29.)

¶ 126.)  The second chart makes the same comparison, but for 2022.  (*Id.* ¶ 130.)  The third chart outlines the Schwab TDFs' rankings in its Morningstar Category.  (*Id.* ¶ 133.)

As alleged, as of 2018 the Schwab TDFs only underperformed the Comparator Funds by approximately 0.11% to 2.01%, and actually outperformed in several instances.  Specifically, the three-year return rate of the Schwab TDFs underperformed by about 0.2% to 2.01%, while the five-year return rate underperformed by about 0.09% to 1.66%.  Moreover, the Schwab TDF Class V five-year return outperformed the Morning Lifetime Index for each fund as of 2018.

The three- and five-year performance from 2018 through 2022 similarly demonstrate that the Schwab TDFs' underperformance was only slight in comparison to the Comparator Funds. The three-year return rate was about 0.09% to 3.16% less than the Comparator Funds, and the five-year return rate underperformed by about 0.04% and 2.35%.  And for both the 2018 and 2022 five-year performance metrics, the various classes of Schwab TDFs underperformed the Comparator Funds by less than 1% on numerous occasions.  These levels of underperformance do not plausibly suggest that Defendants acted imprudently when selecting the Schwab TDFs for the Plan and courts have routinely dismissed claims where the alleged underperformance was minimal, as it is here.  *See Cho*, 2021 WL 4438186, at *9 (finding that allegations of underperformance between 0.07% to 3.17% was not "sufficiently substantial" to support inference that the defendants acted imprudently); *Lard v. Marmon Holdings, Inc.*, Civ. No. 22-4332, 2025 WL 1383269, at *4 n.3 (N.D. Ill. May 13, 2025) (holding that plaintiffs failed to allege a breach of fiduciary duty claim where the challenged funds performed within five percent or less of the top-performing comparator fund); *Luckett v. Wintrust Financial Corp.*, Civ. No. 22-3968, 2024 WL 3823175, at *5 (N.D. Ill. Aug. 14, 2024) (dismissing complaint where the challenged fund "never underperformed the other funds by more than 3 percent" because it did not plausibly infer that a fiduciary acted imprudently).

15

Although Plaintiffs argue that the Schwab TDFs underperformed the Comparator Funds by an average of 8.63% to 38.56% (Opp'n Br. at 30), it is not clear to the Court how Plaintiffs arrived at those numbers. Indeed, the allegations in the Amended Complaint demonstrate the Schwab TDFs generally underperformed the Comparator Funds by less than 3%.[6]

Moreover, Plaintiffs assert that the question of whether a fund sufficiently underperformed to infer an improper process is a factual question that should not be decided on a motion to dismiss. (Opp'n Br. at 31.) In support, Plaintiffs cite *Berkelhammer v. Automatic Data Processing, Inc.*, in which another district court held that "[w]hether underperformance is modest and short in duration raise factual questions that should be tested through discovery, not summarily decided at the motion-to-dismiss stage." Civ. No. 20-5696, 2022 WL 3593975, at *8 (D.N.J. Aug. 23, 2022). However, what the Court must answer at this stage of the proceeding is whether Plaintiffs have plausibly alleged that Defendants breached a fiduciary duty when they selected the Schwab TDFs for the Plan. *See Sweda*, 923 F.3d at 332. Here, accepting Plaintiffs' allegations as true and construing every reasonable inference in their favor, the alleged underperformance does not plausibly support the inference that Defendants acted imprudently.

Plaintiffs further assert that even if the underperformance was minimal, it would have been prudent for Defendants to compare the funds because even a slight difference in performance can have a significant impact on returns. (Opp'n Br. at 32.) In an effort to persuade this Court, Plaintiffs cite to certain district court decisions where the alleged underperformance was around 1% to 2%. (*Id.* at 32–33.) To the extent those cases can be interpreted to hold that allegations of

---

[6] Plaintiffs allege that the Schwab TDFs ranked among the worst funds in their Morningstar Category in 2018 and 2022. (Am. Compl. ¶ 133.) These rankings, however, do not support a plausible inference that Defendants acted imprudently. The five-year returns ending in 2020 show that the Schwab TDFs performed above the median in every fund category. (*Id.*) Likewise, the five-year returns ending in 2018 reflect above-median performance across nearly all fund categories, with only a few exceptions. Viewed holistically and in light of the funds' long-term investment horizon, the Court cannot conclude that the percentile rankings demonstrate imprudence on the part of Defendants.

16

underperformance of 1% to 2%, standing alone, are sufficient to sustain a claim for breach of fiduciary duty, this Court disagrees.[7] ERISA was enacted by Congress to balance "fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Fifth Third Bancorp*, 573 at 424. As such, this Court must consider both "participant and protection and plan creation" at the pleading stage and review the complaint holistically. *Sweda*, 923 F.3d at 327. When viewed from that lens, this Court agrees with the other district courts that have held such slight underperformance does not plausibly support the inference that Defendants acted imprudently. *See Cho*, 2021 WL 4438186, at *9; *Lard*, 2025 WL 1383269, at *4 n.3; *Luckett*, 2024 WL 3823175, at *5; *Dawson v. Brookfield Asset Mgmt. LLC*, Civ. No. 25-852, 2026 WL 835553, at *16 (N.D. Oh. March 26, 2026); *Gonzalez v. Northwell Health, Inc.*, Civ. No. 20-3256, 2024 WL 6935277, at *8 (E.D.N.Y. March 26, 2024); *Ruilova v. Yale-New Haven Hosp. Inc.*, Civ. No. 22-111, 2023 WL 2301962, at *15 (D. Conn. March 1, 2023). That is not to say that underperformance of a few percent could never support an inference of an imprudent process. Rather, only in the context of the specific allegations made in the Amended Complaint, the Court is unable to plausibly infer that Defendants acted imprudently when they selected the Schwab

---

[7] Plaintiffs assert that the Third Circuit in *Sweda* held that slight underperformance was sufficient to state a claim at the pleading stage. (Opp'n Br. at 32.) However, Plaintiffs overstate *Sweda's* holding. There, the Third Circuit held that a complaint "should not be 'parsed piece by piece to determine whether each allegation, in isolation, is plausible.'" *Sweda*, 923 F.3d at 331. In finding that the plaintiffs sufficiently alleged a breach of the fiduciary duty, the Third Circuit noted that the plaintiffs "provided substantial circumstantial evidence from which the District Court could 'reasonably infer' that a breach had occurred," including allegations that the defendants paid unreasonable investment fees, retained high-cost investment options with historically poor performance when lower-cost but otherwise identical alternatives were available, and that the investment options provided were duplicative, which decreased the value of the funds, reduced the plan's leverage, and confused participants. *See id.* at 331–32. Here, in contrast, Plaintiffs allege that the Schwab TDFs underperformed against various Comparator Funds and relevant benchmarks, and that Defendants RKA fees were higher than other similar funds. Plaintiffs do not allege that investment options offered were duplicative, confusing, or that lower cost but identical funds were available. Nor do they allege that Defendants' decision to offer the Schwab TDFs decreased the value of the funds or reduced the Plan's leverage. As explained throughout this Opinion, even when viewing the allegations in the Amended Complaint "holistically," the Court cannot plausibly infer that Defendants acted imprudently when selecting the Schwab TDFs for the Plan.

17

TDFs.  Accordingly, Count One of the Amended Complaint will be dismissed to the extent it is premised on Defendants' selection of the Schwab TDFs for the Plan.

### B.    BREACH OF THE DUTY TO MONITOR (COUNT TWO)

In Count Two, Plaintiffs allege that Novo Nordisk and the Board failed to monitor and evaluate the performance of the Retirement Committee, including by allowing Novo Nordisk to pay for the Plan's RKA services with forfeited funds and monitor the performance of the Schwab TDFs.  (Am. Compl. ¶ 199.)  Defendants argue that this claim must be dismissed because it is derivative of the breach of fiduciary claim in Count One.  (Moving Br. at 26.)

Defendants are correct.  A plaintiff "cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA."  *In re Allergan ERISA Litig.*, Civ. No. 17-155, 2018 WL 8415676, at *7 (D.N.J. July 2, 2018) (internal citations omitted), *aff'd*, 975 F.3d 348 (3d Cir. 2020) (quoting *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016)).  Because the Amended Complaint fails to adequately plead that the Retirement Committee breached its duty of prudence when selecting and maintaining the Schwab TDFs for the Plan, Count Two will be dismissed to the extent it premised on that theory.

### C.    MOTION TO STRIKE

In the Amended Complaint, Plaintiffs add a new prohibited transactions claim in Count Three.  Defendants move to strike this claim under Rule 12(f), arguing that this new claim exceeds the scope of leave to amend the Court previously granted.  (Moving Br. at 25.)

Under Rule 12(f), a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  In the Court's prior Order, it granted Plaintiffs leave to amend their complaint, limited to "addressing the defects identified" in the Court's prior to Opinion.  (ECF No. 35.)  Plaintiffs' initial Complaint did not

include a prohibited transaction claim, nor did the Court identify any defects that could be addressed regarding such a claim. Indeed, Plaintiffs admit that they exceeded the scope of the Court's prior Order, but claim that it is "without consequence." (Opp'n Br. at 35.) Not so. "Where an amended pleading exceeds the scope of the amendments that were previously allowed by a court, district courts in this Circuit either (1) dismiss the pleading in its entirety, or (2) strike the portions of the amended pleading that exceed the scope of the permitted amendments under Rule 12(f)." *N.J. Chinese Community Center v. McAleer*, Civ. No. 21-8320, 2025 WL 1564869, at *8 (D.N.J. June 3, 2025); *see also J.D.'s Mkt.*, 240 F.R.D. at 154 (striking new claims in an amended complaint that exceeded the scope of leave to amend); *Tenny J. Commc'ns, Inc. v. Verizon N.J., Inc.*, 2022 WL 1912390, at *2 (D.N.J. June 2, 2022) ("If the amended complaint 'exceeds the scope of an allowed amendment,' the appropriate remedy is to strike the unauthorized amendments under Federal Rule of Civil Procedure 12(f)."); *T.J. McDermott Transp. Co. v. Cummins, Inc.*, 2017 WL 11476192, at *2 (D.N.J. Jan. 17, 2017) ("A limited grant of leave to amend does not entitle Plaintiffs to amend the complaint outside the scope of that leave."). Accordingly, the Court will exercise its discretion to strike Count Three of the Amended Complaint without prejudice to Plaintiffs' right to seek leave to amend their complaint.

## V.    **CONCLUSION**

For the reasons stated above, the Court will **GRANT** Defendants' Motion without prejudice.  Count One and Two will be dismissed to the extent they are based on Defendants' alleged failure to monitor and select the Schwab TDFs for the Plan.  Count Three will also be struck from the Complaint.  An appropriate Order will follow.


Date: June 24, 2026

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

20